WILLIAM PRYOR, Circuit Judge:
This appeal presents the questions whether due process forbids giving a jury’s findings of negligence and strict liability in a class action against cigarette manufacturers preclusive effect in a later individual suit by a class member and, if not, whether federal law preempts the jury’s findings. Florida smokers and their survivors filed a class action against several tobacco companies, and after a yearlong trial designed to answer common questions concerning the companies’ tortious conduct against all members of the class, a jury found that each company had breached its duty of care and sold defective cigarettes. The Florida Supreme Court upheld the jury verdicts of negligence and strict liability in Engle v. Liggett Group, Inc., 945 So.2d 1246 (Fla. 2006) (Engle III), and decerti-fied the class to allow individual actions about the remaining issues of specific causation, damages, and comparative fault. The Engle decision made clear that the jury findings of negligence and strict liability had preclusive effect in the later individual actions, and the Florida Supreme Court reaffirmed that ruling in Philip Morris USA, Inc. v. Douglas, 110 So.3d 419 (Fla. 2013). R.J. Reynolds Tobacco Company and Philip Morris USA Inc. challenge a jury verdict against them in one of those individual actions in the district court. They argue that giving the Engle findings preclusive effect violates the Due Process Clauses, U.S. Const. Amends. V, XIV, and they urge us to overrule our decision to the contrary in Walker v. R.J. Reynolds Tobacco Co., 734 F.3d 1278 (11th Cir. 2013). They argue, in the alternative, that federal law preempts giving preclu-sive effect to the Engle findings of negligence and strict liability. Because we' reaffirm our holding in Walker and conclude that federal law does not preempt the En-gle jury findings, we affirm the judgments against R.J. Reynolds and Philip Morris.
I. BACKGROUND
In 1994, six individuals filed a putative class action in Florida court against the major domestic cigarette manufacturers, including R.J. Reynolds and Philip Morris, and two tobacco industry organizations. Id. at 1281. They alleged claims of strict liability, negligence, breach of express warranty, breach of implied warranty, fraud, conspiracy to commit fraud, and intentional infliction of emotional distress. Id. The strict liability count alleged that the companies manufactured “cigarettes containing nicotine,” “manufactured their defective tobacco products by manipulating the levels of nicotine so as to addict the consuming public,” “failed to design, manufac-' ture, distribute and sell a safer alternative cigarette that would not addict smokers,” and “failed to warn” members of the class of the dangers. The negligence count alleged that the companies “breached their duty of reasonable care” through several “acts and omissions,” including the “failure to design and manufacture products that were not addictive,” the “failure to ... adequately or sufficiently reduce or remove the level of nicotine in cigarettes,” and the “failure to warn the smoking consumers of the addictive nature of nicotine.” A Florida district court of appeal approved the certification of the following class: all Florida citizens and residents, “and their survivors, who have suffered, presently suffer or have died from diseases and medical conditions caused by the addiction to cigarettes that contain nicotine.” R.J. Reynolds Tobacco Co. v. Engle, 672 So.2d 39, 40-42 (Fla. Dist. Ct. App. 1996) (Engle I).
*1175 The trial court in Engle divided the proceedings in three phases. Walker, 734 F.3d at 1281. In Phase I, a jury “decidefd] issues common to the entire class, including general causation, the Engle defendants’ common liability to the class members ..., and the class’s entitlement to punitive damages.” Douglas, 110 So.3d at 422. Phase I was a year-long trial on “common issues relating exclusively to defendants’ conduct and the general health effects of smoking.” Liggett Grp. Inc. v. Engle, 853 So.2d 434, 441 (Fla. Dist. Ct. App. 2003) (Engle II)- Phase I required “hundreds of witnesses, thousands of documents and exhibits, and tens of thousands of pages of testimony.” Douglas, 110 So.3d at 431. In Phase II, the jury determined the liability of the tobacco companies to three class representatives, awarded them compensatory damages, and fixed the amount of class-wide punitive damages. Walker, 734 F.3d at 1281. The trial court planned to have new juries decide specific causation and damages for the remaining class members in Phase III. Id.
In his opening statement in Phase I, the plaintiffs’ attorney stated, “The evidence will show, ladies and gentlemen, that there is no dispute or controversy in the medical and scientific communities but that cigarette smoking causes lung cancer, heart disease, chronic obstructive pulmonary disease, emphysema and many other diseases.” He stated that “the evidence will establish overwhelmingly” that “[njicotine is addictive.” And he explained that the tobacco companies “have the technology to make a safer cigarette” but not one that is profitable. He also stated that “the evidence will show that the tobacco companies have so successfully misled the American people that many highly intelligent people, in 1998, are confused.”
The smokers presented a substantial body of evidence that all of the cigarettes manufactured by the named defendants contained carcinogens that cause disease, including cancer and heart disease, and that nicotine addicts smokers. Douglas, 110 So.3d at 423. They presented evidence that the tobacco companies “failed to address the health effects and addictive nature of cigarettes, manipulated nicotine levels to make cigarettes more addictive, and concealed information about the dangers of smoking.” Id. For example, Dr. Julius Richmond, a former Surgeon General of the United States and professor at the Harvard Medical School, testified that cigarettes contain carcinogens and that cigarettes cause pulmonary disease, emphysema, lung cancer, heart disease, and bladder disease. Dr. Ronald Davis, a former director of the Office on Smoking and Health and former medical director for the Michigan Department of Public Health, testified similarly that cigarette smoking is addictive and that those who smoke have a heightened risk of stroke, emphysema, cancer, and heart disease. Dr. David Burns, a professor of medicine at the University of California, San Diego, School of Medicine, with a specialty in pulmonary and critical care medicine, testified that nicotine is addictive and that cigarette smoking causes cancers, lung disease, and heart disease. He was an associate scientific editor of a 1981 Surgeon General’s Report, and he explained that “the purpose of the report was to make it .very clear to the public that there is no safe cigarette and there is no safe level of consumption.” He testified, “[Wjith the exception of the tobacco industry, no other scientific group in the last 30 years has reviewed this evidence and reached a conclusion other than that cigarette smoking causes disease.” Dr. John Holbrook, professor of medicine at the University of Utah School of Medicine, who is board certified in the field of internal medicine, testified that, in his experience, the tobacco industry “attempted to confound and obfuscate science” in its *1176 funding of medical research. Dr. W. Jar-rard Goodwin, a professor at the University of Miami School of Medicine, with a specialty in otolaryngology, testified that smoking causes cancer of the mouth, larynx, and pharynx. Dr. Edward Staples, director of the artificial heart program at the University of Florida, testified that cigarette smoking causes emphysema, lung cancer, coronary artery disease, and atherosclerosis. Dr. Neal Benowitz, a doctor at San Francisco General Hospital and professor of medicine, psychiatry, and bio-pharmaceutical sciences at the University of California in San Francisco, testified that 90 percent of individuals begin smoking before the age of 20 and, within two or three years, those young people will become addicted to nicotine. He stated that tobacco companies could reduce the level of nicotine in cigarettes to nonaddictive quantities. Some of the evidence of design defects applied only to some brands of cigarettes. For example, the smokers presented evidence that people who smoke light cigarettes tend to smoke more and inhale more deeply. But the common thrust of the smokers’ evidence was that all of the companies’ cigarettes cause disease and addict smokers.
The tobacco companies put on evidence to defend themselves against the several theories of liability. For example, the companies repeatedly challenged the evidence that cigarette smoking causes disease. Dr. George Hensley, a former professor at the University of Miami School of Medicine with a specialty in pathology, testified that smoking does not cause pancreatic cancer. Dr. Hugh Gilmore, a cardiology professor at the University of Miami School of Medicine, testified that smoking is not a risk factor for the development of aortic aneurysms or congestive heart failure. And Dr. Alden Cockburn, a urologist and a clinical professor at the University of South Florida, testified that smoking is a risk factor for bladder cancer but was not definitively proven to be a cause of bladder cancer.
In closing argument, the smokers’ attorney explained that “[t]he common issue trial has addressed the conduct of the tobacco industry.” He recounted some of the expert testimony. He argued, without focusing on any specific brand or manufacturer of cigarettes, that scientists agree that nicotine is addicting, and he argued that there is no scientific debate as to whether cigarette smoking causes certain diseases, including cancer and heart disease. He said, “None of them qualified their answer one iota. Does cigarette smoking cause these diseases? Yes, yes, yes. Clear, crisp and definitive.” He also referred the jury to a collection of documents that discussed how the companies manipulated nicotine levels. He mentioned different methods of manipulating nicotine levels but not different brands.
In closing argument, the tobacco companies’ attorneys responded to the smokers’ many arguments. The companies contended that cigarettes are not proven to be addictive. They maintained that smokers can quit and that nicotine is a “far cry from heroin or cocaine.” And the companies argued that they have tried to make cigarettes safer. They argued that they have not “spiked” cigarettes with nicotine but have reduced the level of nicotine in some cigarettes.
The trial court instructed the jury in Phase I about the claim of strict liability and negligence without regard to specific brands of cigarettes. For the claim of strict liability, the trial court explained that “the issues are whether one or more of the defendants designed, manufactured and marketed cigarettes which were defective and unreasonably dangerous to smokers.” For the claim of negligence, the trial court instructed the jury as follows:
*1177 On the claim of negligence, the issues are whether one or more of the defendants were negligent in manufacturing, designing, marketing, selling and distributing cigarettes which defendants knew or should have known would cause serious and fatal diseases, including lung cancer, or dependence-producing substances; in negligently not testing tobacco and commercial cigarettes to confirm that smoking causes human disease; in failing to design and produce a reasonably safe cigarette with lower nicotine levels; in negligently measuring and ... understating nicotine and tar levels in low-tar cigarettes; and in failing to warn smokers of the dangers of smoking and the addictiveness or dependence-producing effects of cigarettes prior to July 1 of 1969.
The verdict form included a series of yes-or-no questions. The tobacco companies requested a more detailed verdict form, in which the jury would be asked to identify “specific defects and tortious actions,” but the trial court rejected that proposal. Id. The jury returned its verdict after eight days of deliberation. The first question on the verdict form asked whether smoking cigarettes causes a list of enumerated diseases and medical conditions. The jury answered “yes” for 20 specific diseases, including various forms of cancer. The second question asked whether “cigarettes that contain nicotine [are] addictive or dependence producing.” The jury answered “yes.” The verdict form then contained nine questions about the conduct of each tobacco company. One of the nine questions asked the jury to decide whether each tobacco company was strictly liable. It asked if the tobacco company “place[d] cigarettes on the market that were defective and unreasonably dangerous.” Another question asked if each tobacco company was negligent. It asked if the tobacco company “failed to exercise the degree of care which a reasonable cigarette manufacturer would exercise under like circumstances.” The jury answered “yes” to each of these nine questions for each tobacco company. The last question on the verdict form asked the jury whether the actions of the tobacco companies entitled the class to punitive damages, and the jury answered “yes” for each tobacco company.
The trial court denied the tobacco companies’ motion for directed verdict. Id. Regarding strict liability, the court ruled that the evidence supported a finding that all of the tobacco companies’ cigarettes were defective even if some of the cigarettes had brand-specific dangers:
There was more than sufficient evidence at trial to satisfy the legal requirements of this Count and to support the jury verdict that cigarettes manufactured and placed on the market by the defendants were defective in many ways including the fact that the cigarettes contained many carcinogens, nitrosamines, and other deleterious compounds such as carbon monoxide. That levels of nicotine were manipulated, sometime by utilization of ammonia to achieve a desired “free basing effect” of pure nicotine to the brain, and sometime by using a higher nicotine content tobacco called Y-l, and by other means such as manipulation of the levels of tar and nicotine. The evidence more than sufficiently proved that nicotine is an addictive substance which when combined with other deleterious properties, made the cigarette unreasonably dangerous. The evidence also showed some cigarettes were manufactured with the breathing air holes in the filter being too close to the lips so that they were covered by the smoker thereby increasing the amount of the deleterious effect of smoking the cigarette. There was also evidence at trial that some filters being test marketed utilize glass fibers that could produce *1178 disease and deleterious effects if inhaled by a smoker.
Engle v. R.J. Reynolds Tobacco, 2000 WL 33534572, at *2 (Fla. Cir. Ct. 2000). Regarding negligence, the court ruled that the evidence supported a finding that the tobacco companies were negligent in producing and selling all of their cigarettes:
The verdict of the jury on the issue of Negligence is well supported by the evidence .... The defendants according to the testimony, well knew from their own research, that cigarettes were harmful to health and were carcinogenic and addictive. By allowing the sale and distribution of said product under those circumstances without taking reasonable measures to prevent injury, constitutes, in this Court[’]s opinion, and in the opinion of the jury as it turns out, negligence.
Id. at *4.
In Phase II, the same jury determined that the tobacco companies were liable to the three class representatives and awarded them compensatory damages totaling $12.7 million. Walker, 734 F.3d at 1282. The jury awarded punitive damages of $145 billion to the class. Id. The tobacco companies filed an interlocutory appeal of the judgments in Phases I and II. Id.
The Florida Supreme Court approved in part and vacated in part the jury verdicts. Engle III, 945 So.2d at 1254. The Florida Supreme Court concluded that the trial court did not abuse its discretion in certifying the class for purposes of Phase I and II. Id. at 1267. But the court decertified the class for Phase III “because individualized issues such as legal causation, comparative fault, and damages predominate.” Id. at 1268. The Florida Supreme Court “retained]” the findings of liability by the jury from Phase I “other than those on the fraud and intentional infliction of emotion[al] distress claims, which involved highly individualized determinations, and the finding on entitlement to punitive damages questions, which was premature.” Id. at 1269. The court explained, “Class members can choose to initiate individual damages actions,” and those retained findings, which include the findings that the companies acted negligently and that they sold defective products, “will have res judicata effect in those trials.” Id. The court affirmed the damages award in favor of two of the class representatives and vacated the judgment in favor of the third class representative because the statute of limitations barred his claims. Id. at 1276. The court vacated the award of punitive damages. Id. at 1262-65.
After members of the Engle class filed thousands of individual actions in state and federal courts, these courts had to determine the extent to which the smokers could rely on the approved findings from Phase I to establish certain elements of their claims. Walker, 734 F.3d at 1283. In Brown v. R.J. Reynolds Tobacco Co., 611 F.3d 1324 (11th Cir. 2010), we stated that, under Florida law, courts should give pre-clusive effect to the findings only to the extent that the smoker can “show with a ‘reasonable degree of certainty’ that the specific factual issue was determined in [his] favor.” Id. at 1335 (quoting Seaboard Coast Line R. Co. v. Indus. Contracting Co., 260 So.2d 860, 865 (Fla. Dist. Ct. App. 1972)). We remanded to the district court to make that determination after considering the “entire trial record.” Id. But several of the Florida district courts of appeal disagreed with our decision that a member of the Engle class had to establish from the trial record that an issue was actually decided. These district courts of appeal all held that the Phase I findings established the duty and breach elements of the smokers’ claims, though they disagreed about how the smokers would prove causation in individual cases. See Philip Morris USA, Inc. v. Douglas, 83 So.3d 1002, 1010 *1179 (Fla. Dist. Ct. App. 2012); R.J. Reynolds Tobacco Co. v. Brown, 70 So.3d 707, 715-16 (Fla. Dist. Ct. App. 2011); R.J. Reynolds Tobacco Co. v. Martin, 53 So.3d 1060, 1066-70 (Fla. Dist. Ct. App. 2010).
In Douglas, the Florida Supreme Court ruled that the approved findings from Phase I established common elements of the claims of Engle class members. 110 So.3d at 428-30. The court explained that, although the evidence submitted during Phase I included both general and brand-specific defects, “the class action jury was not asked to find brand-specific defects in the Engle defendants’ cigarettes.” Id. at 423. The jury was asked to determine “all common liability issues,” and it heard evidence that the tobacco companies’ cigarettes were “defective because they are addictive and cause disease.” Id. The court explained that the approved findings concerned conduct that “is common to all class members and will not change from case to case” and that “the approved Phase I findings are specific enough” to establish some elements of the smokers’ claims. Id. at 428. That is, the jury findings “conclusively establish” that the tobacco companies manufactured defective products and that the companies failed to exercise the degree of care of a reasonable person. Id. at 430. And the jury findings establish general causation. Id. at 428. Going forward, “to prevail on either strict liability or negligence Engle claims, individual plaintiffs must establish (i) membership in the Engle class; (ii) individual causation, i.e., that addiction to smoking the Engle defendants’ cigarettes containing nicotine was a legal cause of the injuries alleged; and (in) damages.” Id. at 430.
The Florida Supreme Court then held that giving preclusive effect to the approved findings from Phase I did not violate the right to due process of the tobacco companies. Id. The companies had argued that “accepting the Phase I findings as res judicata violates their due process rights because it is not clear from the Phase I verdict which theories of liability the Engle jury actually decided to reach those findings.” Id. The Douglas court concluded that the tobacco companies had notice and an opportunity to be heard and that the Engle proceedings did not arbitrarily deprive them of property. Id. at 431. It explained that “the Phase I verdict against the Engle defendants resolved all elements of the claims that had anything to do with the Engle defendants’ cigarettes or their conduct.” Id. at 432.
The Douglas court stated, “[T]he defendants’ due process argument is an attack on our decision in Engle to give the Phase I findings res judicata—as opposed to issue preclusion—effect in class members’ individual damages actions.” Id. The Douglas court explained that, when it gave “res judicata effect” to the Phase I approved findings, Engle III, 945 So.2d at 1269, it meant claim preclusion, not issue preclusion. Douglas, 110 So.3d at 432. The Douglas court stated that claim preclusion prevents the same parties from relitigating the same cause of action. Id. Issue preclusion prevents the parties from relitigating “the same issues that were litigated and actually decided in a second suit involving a different cause of action.” Id. at 433. The Douglas court ruled that the individual Engle actions involved the same causes of action. Id. The Douglas court stated, “[T]o decide here that we really meant issue preclusion even though we said res judica-ta in Engle would effectively make the Phase I findings regarding the Engle defendants’ conduct useless in individual actions.” Id. And the Douglas court concluded that the tobacco companies “do not have the right to have issue preclusion, as opposed to res judicata, apply to the Phase I findings.” Id. at 435.
*1180 In Walker, we held that giving res judi-cata effect to the findings of the jury in Engle did not violate the rights of the tobacco companies to due process. Walker, 734 F.3d at 1280-81. R.J. Reynolds had appealed the jury verdicts in favor of two smokers after the district courts instructed the juries that R.J. Reynolds sold defective cigarettes and was negligent. Id. at 1286. We explained that we were obligated to give “full faith and credit to the decision in Engle, as interpreted in Douglas,” unless it “would arbitrarily deprive R.J. Reynolds of its property without due process of law.” Id. at 1287. We stated that no court “has ever held that due process requires application of the federal common law of issue preclusion,” and we did not decide whether it does. Id. at 1289. We concluded that, even if due process requires that an issue be actually decided, the Florida Supreme Court ruled in Douglas that the approved findings from Phase I concerned conduct that is common to all class members and established negligence and defect elements of the class members’ claims. Id. We concluded that the “actually decided” requirement was satisfied and that it is “no concern of ours” what the Florida Supreme Court calls the “relevant doctrine.” Id.
In this appeal, R.J. Reynolds and Philip Morris challenge a jury verdict in favor of Earl Graham, as personal representative of the estate of his deceased wife, Faye Graham, a member of the Engle class. Mr. Graham filed an individual Engle action in the district court against R.J. Reynolds, Philip Morris, and other defendants later dismissed. He alleged that his wife developed lung cancer and died because of her addiction to cigarettes manufactured by R.J. Reynolds and Philip Morris. He asserted claims of strict liability, breach of warranty, negligence, fraudulent concealment, and conspiracy to fraudulently conceal.
Under the Engle framework articulated in Douglas, the jury was not asked to find that the cigarettes Faye Graham smoked were defective or that the tobacco companies were negligent. Graham v. R.J. Reynolds Tobacco Co., 782 F.3d 1261, 1273 (11th Cir. 2015), reh’g en banc granted, op. vacated, 811 F.3d 434 (11th Cir. 2016). The district court treated those findings as having already been established. Id. For the claims of negligence and strict liability, the jury was asked to determine only whether Faye Graham was a member of the Engle class and whether smoking cigarettes manufactured by R.J. Reynolds or Philip Morris “was a legal cause” of Faye Graham’s injuries. Id. The district court instructed the jury that, to find legal causation, Graham’s addiction to cigarettes must have “directly and in natural and continuous sequence produced or contributed substantially to producing” her injuries.
The jury found for Graham on the claims of strict liability and negligence. Id. The jury awarded Graham $2.75 million in damages and determined that Faye Graham was 70 percent at fault, R.J. Reynolds was 20 percent at fault, and Philip Morris was 10 percent at fault. Id. at 1273-74. The district court entered judgment against R.J. Reynolds for $550,000 and against Philip Morris for $275,000. Id. at 1274. The district court denied the tobacco companies’ motion for judgment as a matter of law. Id. Theresa Graham later replaced Earl Graham as personal representative of the estate.
A panel of this Circuit reversed the judgment of the district court. Id. at 1285. The panel held that the Engle findings of strict liability and negligence are preempted by federal law. Id. We later granted the petition for rehearing en banc filed by Graham and vacated the panel opinion. Graham,,811 F.3d at 434-35. In addition to *1181 briefing the preemption issue, we allowed the parties to brief whether giving effect to the jury’s findings in Engle would “violate the tobacco companies’ rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution notwithstanding the panel’s holding in Walker.” The Florida Supreme Court has since ruled that federal law does not preempt “state tort” actions against the tobacco companies and that, even if federal law preempted a ban on the sale of cigarettes, the Engle Phase I findings do “not amount to ... a ban” that might conflict with federal law. R.J. Reynolds Tobacco Co. v. Marotta, No. SC16-218, 214 So.3d 590, 600, 2017 WL 1282111, at *9 (Fla. Apr. 6, 2017).
II. STANDARD OF REVIEW
We review de novo the denial of a motion for judgment as a matter of law. Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc). We also review de novo questions of constitutional law, Nichols v. Hopper, 173 F.3d 820, 822 (11th Cir. 1999), and whether federal law preempts a state law claim, Atwater v. Nat’l Football League Players Ass’n, 626 F.3d 1170, 1179 (11th Cir. 2010).
III. DISCUSSION
We divide our discussion in two parts. First, we explain why giving full faith and credit to the Engle jury findings of negligence and strict liability does not deprive R.J. Reynolds and Philip Morris of property without due process of law. Second, we conclude that the Engle jury findings of negligence and strict liability are not preempted by federal law.

A. Giving Preclusive Effect to the Negligence and Strict Liability Findings Does Not Violate Due Process.

 The Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to “give preclusive effect to a state court judgment to the same extent as would courts of the state in which the judgment was entered,” Kahn v. Smith Barney Shearson Inc., 115 F.3d 930, 933 (11th Cir. 1997) (quoting Battle v. Liberty Nat’l Life Ins. Co., 877 F.2d 877, 882 (11th Cir. 1989)), subject to the requirements of the Due Process Clause, see Kremer v. Chem. Const. Corp., 456 U.S. 461, 481, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). R.J. Reynolds and Philip Morris argue that the Due Process Clause mandates that an issue be actually ■ decided in one case before it is given preclusive effect in another. They argue that relying on the approved jury findings in individual actions by Engle members is an application of issue preclusion and that the Florida courts did not actually decide issues of strict liability and negligence for all class members. They argue that by abandoning the “actually decided” requirement, the Florida courts abrogated a fundamental protection against arbitrary deprivations of property in violation of the Due Process Clause. See Honda Motor Co. v. Oberg, 512 U.S. 415, 430, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994).
We need not determine whether the Due Process Clause requires that an issue be actually decided in an earlier case before the judgment from that case is given pre-clusive effect on that issue. We will assume, without deciding, that the “actually decided” requirement is a fundamental requirement of due process under Fayer-weather v. Ritch, 195 U.S. 276, 25 S.Ct. 58, 49 L.Ed. 193 (1904). Even with that assumption, no violation of due process occurred when the district court gave the Engle findings preclusive effect. Based on our review of the Engle proceedings, we are satisfied that the Engle jury actually decided common elements of the negligence and strict liability of R.J. Reynolds and Philip Morris.
*1182 The Florida Supreme Court made clear in Douglas that the Engle jury decided common elements of the negligence and strict liability of the tobacco companies for all class members. And for that reason, the Florida Supreme Court explained that the findings were binding in individual Engle actions. It stated, “Because these findings go to the defendants’ underlying conduct, which is common to all class members and will not change from case to case, we held that these approved ‘Phase I common core findings ... will have res judicata effect’ in class members’ ‘individual damages actions.’ ” Douglas, 110 So.3d at 428 (alteration in original) (quoting Engle III, 945 So.2d at 1269).
The Florida Supreme Court rejected the same argument that R.J. Reynolds and Philip Morris make here about what the Engle jury decided. R.J. Reynolds and Philip Morris asserted that some of the evidence presented at the Engle trial applied to specific brands of cigarettes. They argued that, although the Engle jury found that the tobacco companies “place[d] cigarettes on the market that were defective and unreasonably dangerous,” the jury did not necessarily find that all cigarettes the defendants placed on the market were defective and unreasonably dangerous. The Florida Supreme Court rejected this argument and stated that “this Court in Engle necessarily decided that the approved Phase I findings” are “specific enough to establish a causal link between their conduct and damages to individual plaintiffs who prove- injuries caused by addiction to smoking the Engle defendants’ cigarettes.” Id. That is, the Phase I findings establish the causal link between the tobacco companies’ conduct and the class members’ injuries because the companies acted wrongfully toward all of the class members. Whether that conduct was the legal cause of the individual class members’ injuries, and whether the individual class members were entitled to damages, was left for later individual trials.
After reviewing the Engle trial record, we are satisfied that the Florida Supreme Court determined that the Engle jury found the common elements of negligence and strict liability against Philip Morris and R.J. Reynolds. Both companies admit that the smokers presented common “proof that the Engle defendants’ cigarettes were defective because they are addictive and cause disease” in addition to brand-specific evidence. Id. at 423. In two days of closing arguments, the smokers’ attorneys recounted the ample body of evidence that smoking cigarettes causes disease without focusing on the differences in the designs of various brands. The trial court instructed the jury to “determine ‘all common liability issues’ for the class concerning ‘the conduct of the tobacco industry.’ ” Id. Moreover, the jury’s answers on the verdict form, when read together with the entire record, were consistent with the general theories that the tobacco companies’ cigarettes are defective and the sale of their cigarettes is negligent because all of those cigarettes cause disease and are addictive.
The first two questions on the verdict form are most naturally read to apply to all cigarettes manufactured by the tobacco companies. Question 1 asked whether “smoking cigarettes cause one or more of the following diseases or medical conditions.” The jury answered “yes” to 20 of 23 diseases. This question does not admit of any limitation, nor did the accompanying jury instruction, and its natural interpretation is that it was asking about all cigarettes manufactured by the tobacco companies, not just some. Similarly, question 2 asked whether “cigarettes that contain nicotine [are] addictive or dependence producing,” and the jury answered “yes.” The evidence at trial was that nicotine, and not *1183 some other ingredient, made cigarettes addictive. In closing arguments, the tobacco companies’ counsel told the jury that the question should be understood to inquire whether “all cigarettes that contain nicotine [are] addictive or dependence-producing,” not whether there is “one cigarette or a brand of cigarettes or two brands of cigarettes” that are addictive.
The strict liability and negligence questions presented to the jury used the same unmodified noun—“cigarettes”—that was used to refer to all cigarettes manufactured by the tobacco companies in questions 1 and 2. The strict liability interrogatory asked whether “one or more of the defendant tobacco companies place[d] cigarettes on the market that were defective and unreasonably dangerous,” and the negligence interrogatory inquired whether the smokers had “proven that one or more of the defendant tobacco companies failed to exercise the degree of care which a reasonable cigarette manufacturer would exercise under like circumstances.” The jury answered “yes” to both questions for R.J. Reynolds and Philip Morris. When asked about strict liability, the jury found that R.J. Reynolds and Philip Morris had sold defective cigarettes “both before and after July 1,1974,” and, with respect to the negligence claim, that they had acted negligently by selling, manufacturing, and distributing cigarettes “both before and after July 1, 1969.” That the jury found that these tobacco companies’ tortious conduct swept across both time periods is consistent with a general theory of liability that applied to all their cigarettes.
After the jury returned a verdict in favor of the class on all counts, the trial court ruled that there was sufficient evidence to support those verdicts, including negligence and strict liability, and cited evidence that applied to all of the cigarettes made by the tobacco companies. For example, it stated,. “The evidence more than sufficiently proved that nicotine is an addictive substance which when combined with other deleterious properties, made the cigarette unreasonably dangerous.” Engle, 2000 WL 33534572, at *2. The only way to make sense of these proceedings is that the Florida courts determined that the Engle jury actually decided issues common to the class, and the district court did not abrogate a protection against arbitrary deprivations of property in affording the Phase I jury’s findings preclusive effect in Graham’s case.
R.J. Reynolds and Philip Morris argue that if the Florida Supreme Court had determined that the Engle jury actually decided common elements of negligence and strict liability for all class members, it would not have used the term “claim preclusion” in Douglas to refer to the preclu-sive effect of the jury findings and thereby evade the “actually decided” requirement, but we disagree. The Florida Supreme Court explained that issue preclusion applies in actions involving different causes of action and claim preclusion applies in actions involving the same causes of action. Douglas, 110 So.3d at 432-33. And in explaining the differences between claim preclusion and issue preclusion, the Florida Supreme Court reiterated that the Engle jury made findings about the tobacco companies’ conduct that applied to all class members. It said, “No matter the wording of the findings on the Phase I verdict form, the jury considered and determined specific matters related to the [Engle] defendants’ conduct. Because the findings are common to all class members, [individual plaintiffs are] entitled to rely on them .... ” Id. at 433 (alterations in original) (quoting Martin, 53 So.3d at 1067).
The terminology employed by the Florida Supreme Court was unorthodox, but “[i]n determining what is due process of law, regard must be had to substance, *1184 not to form.” Fayerweather, 195 U.S. at 297, 25 S.Ct. 58. The Supreme Court of the United States has acknowledged that “[t]he preclusive effects of former adjudication are discussed in varying and, at times, seemingly conflicting terminology, attributable to the evolution of preclusion concepts over the years.” Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 77 n.1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). As long as the state proceedings “satisfied] the minimum procedural requirements” of due process, Kremer, 456 U.S. at 481, 102 S.Ct. 1883, what the Florida Supreme Court “calls the relevant doctrine ... is no concern of ours,” Walker, 734 F.3d at 1289.
Apart from their argument that the jury did not actually decide common issues of negligence and strict liability, R.J. Reynolds and Philip Morris do not deny that they were afforded due process. That is, they do not contend that they were denied notice or an opportunity to be heard, the central features of due process. See Fuentes v. Shevin, 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). The Florida courts provided them notice that the jury findings would establish the “conduct elements of the class’s claims.” Douglas, 110 So.3d at 429. And the yearlong trial provided them “a full and fair opportunity to litigate the issues of common liability in Phase I.” Walker, 734 F.3d at 1288. Both tobacco companies seized that opportunity, presenting “testimony that cigarettes were not addictive and were not proven to cause disease and that they had designed the safest cigarette possible.” Douglas, 110 So.3d at 423. And they continue to contest liability in individual actions by class members, in which new juries determine issues of individual causation, apportionment of fault, and damages. Id. at 430; Engle III, 945 So.2d at 1254.
The Due Process Clause does not require a state to follow the federal common law of res judicata and collateral es-toppel. “State courts are generally free to develop their own rules for protecting against the relitigation of common issues or the piecemeal resolution of disputes.” Richards v. Jefferson Cty., 517 U.S. 793, 797, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996). For example, a state might allow offensive, non-mutual collateral estoppel. E.g., In re Owens, 125 Ill.2d 390, 126 Ill.Dec. 563, 532 N.E.2d 248, 252 (1988). And courts, both state and federal, frequently manage class actions by splitting them into separate phases. See generally William B. Ruben-stein, Newberg on Class Actions §§ 10.6, 11.3 (5th ed.). Engle is not the first time that “a defendant’s common liability [was] established through a class action and given binding effect in subsequent individual damages actions.” Douglas, 110 So.3d at 429 (collecting cases); see also Brown v. Electrolux Home Prods., Inc., 817 F.3d 1225, 1239 (11th Cir. 2016) (discussing several “tools to decide individual damages” in a class action, including “(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; [and] (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages” (quoting In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 141 (2d Cir. 2001))). The Due Process Clause requires only that the application of principles of res judicata by a state affords the parties notice and an opportunity to be heard so as to avoid an arbitrary deprivation of property. Fuentes, 407 U.S. at 80, 92 S.Ct. 1983. '
We recognize that the Engle Court defined a novel notion of res judica- *1185 ta, but we cannot say that the substance of that doctrine or its application in these trials was so unfair as to violate the constitutional guarantee of due process. “The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation,” Cafeteria & Rest Workers Union, Local 473, AFL-CIO v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), and our review of the record establishes that the tobacco companies had notice that the Engle trial involved common evidence and theories of negligence and strict liability that applied to all cigarettes manufactured by all tobacco companies and sold to all members of the class during the relevant periods. The tobacco companies were given an opportunity to be heard on the common theories in a year-long trial followed by an appeal to the Florida Supreme Court and later individual trials and appeals on the remaining issues of proximate causation, comparative fault, and damages. See Engle III, 945 So.2d at 1254-56.
Contrary to the dissent’s view, see Dissenting Op. of Tjoflat, J., at 1213-14, no tobacco company can be held liable to any smoker without proof at trial that the smoker belongs to the Engle class, that she smoked cigarettes manufactured by the company during the relevant class period, and that smoking was the proximate cause of her injury. Every tobacco company must also be afforded the opportunity to contest the smokers’ pleadings and evidence and to plead and prove the smokers’ comparative fault. Indeed, in this appeal, after the district court instructed it, the jury reduced Graham’s damages award for his deceased spouse’s comparative fault. And in other Engle progeny litigation, tobacco companies have won defense verdicts. E.g., Suarez v. R.J. Reynolds Tobacco Co., No. 09-79584-CA-01, 2015 WL 12776786 (11th Fla. Cir. Ct., Nov. 25, 2015) (final judgment). “[S]tate proceedings need do no more than satisfy the minimum procedural requirements” of due process to receive full faith and credit. Kremer, 456 U.S. at 481, 102 S.Ct. 1883. The record in this appeal establishes that R.J. Reynolds and Philip Morris were afforded the protections mandated by the Due Process Clause.
“Under the Full Faith and Credit Act, federal courts generally should respect state court judgments, even where erroneous.” Lops v. Lops, 140 F.3d 927, 938 (11th Cir. 1998); see also Hickerson v. City of New York, 146 F.3d 99, 107 (2d Cir. 1998) (“[T]o second-guess that court’s de termination of this issue would violate the full faith and credit statute.”). We decide only whether applying Florida law in this case violates due process. We do not endorse or condemn the use of a class action in Phase I of the Engle litigation. Nor do we endorse or condemn the explication of res judicata by the Supreme Court of Florida. We say only that applying Florida law in this trial did not violate the tobacco companies’ rights to due process of law.
R.J. Reynolds and Philip Morris argue that we are not compelled to give full faith and credit to Douglas because Graham was not a party in Douglas and Florida law does not allow non-mutual issue preclusion. Because state courts would not be bound by the Douglas decision in this circumstance, they argue, we are also not bound. But this argument is a straw man.
We do not give full faith and credit to the decision in Douglas', we instead give full faith and credit to the jury findings in Engle. The Florida Supreme Court in Engle interpreted those findings to determine what the jury actually decided, and the Florida Supreme Court in Douglas decided a matter of state law when it explained the preclusive effect of the En-gle jury’s Phase I findings. We are bound by the decisions of state supreme courts on matters of state law when we exercise *1186 diversity jurisdiction, subject to the constraints of due process. See Walker, 734 F.3d at 1284. We conclude that giving pre-clusive effect to the findings of negligence and strict liability by the Engle jury in individual actions by Engle class members against R.J. Reynolds and Philip Morris does not deprive these tobacco companies of property without due process of law.

B. Federal Law Does Not Preempt the Jury Findings of Negligence and Strict Liability.

“The Supremacy Clause of Art. VI of the Constitution provides Congress with the power to pre-empt state law.” La. Pub. Serv. Comm’n v. FCC, 476 U.S. 355, 368, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986). “State action may be foreclosed by express language in a congressional enactment, by implication from the depth and breadth of a congressional scheme that occupies the legislative field, or by implication because of a conflict with a congressional enactment.” Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 541, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (citations omitted). Conflicts arise in two ways: “when compliance with both federal and state regulations is impossible or when the state law ‘stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,’ ” Hillman v. Maretta, — U.S. -, 133 S.Ct. 1943, 1950, 186 L.Ed.2d 43 (2013) (citation omitted) (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). “ ‘[T]he purpose of Congress is the ultimate touchstone’ in every pre-emption case.” Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (quoting Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)). “Congress’ intent, of course, primarily is discerned from the language of the pre-emption statute and the ‘statutory framework’ surrounding it.” Id. at 486, 116 S.Ct. 2240 (quoting Gade v. Nat’l Solid Wastes Mgmt. Ass’n, 505 U.S. 88, 111, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (Kennedy, J., concurring in part and concurring in the judgment)).
This appeal presents an issue of conflict preemption. A party asserting conflict preemption faces a high bar:
[I]n all pre-emption cases, and particularly in those in which Congress has “legislated ... in a field which the States have traditionally occupied,” ... we “start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.”
Wyeth v. Levine, 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (second and third alteration in original) (quoting Lohr, 518 U.S. at 485, 116 S.Ct. 2240).
R.J. Reynolds and Philip Morris argue that the obstacle form of conflict preemption defeats the findings of negligence and strict liability in Engle. They argue that this Circuit avoided finding a violation of due process in Walker by construing the Engle findings as embracing a theory that all cigarettes manufactured by the tobacco companies are defective and the sale of all of those cigarettes is negligent because all of those cigarettes are dangerous—that is, that all of those cigarettes are addictive and cause disease. Federal law, they contend, preempts state law claims premised on the theory that all of the cigarettes manufactured by the tobacco companies are inherently dangerous.
We disagree. We conclude that federal tobacco laws do not preempt state tort claims based on the dangerousness of all the cigarettes manufactured by the tobacco companies. In other words, federal law does not preempt the Engle jury findings.
Congress has enacted six tobacco-specific laws that are relevant to this appeal. In *1187 1965, Congress passed the Federal Cigarette Labeling and Advertising Act, Pub. L. No. 89-92, 79 Stat. 282, which made it unlawful to sell cigarettes without the following warning label: “Caution: Cigarette Smoking May Be Hazardous to Your Health.” Id. § 4, 79 Stat. at 283. And the Act prohibited requiring any additional “statement relating to smoking and health” on cigarette packages or in cigarette advertising. Id. § 5, 79 Stat. at 283. Congress then passed the Public Health Cigarette Smoking Act of 1969, Pub. L. No. 91-222, 84 Stat. 87, which changed the language of the warning label to “Warning: The Surgeon General Has Determined That Smoking Is Dangerous to Your Health.” Id. § 2, 84 Stat. at 88. The Act made it “unlawful to advertise cigarettes on any medium of electronic communication subject to the jurisdiction of the Federal Communications Commission.” Id., 84 Stat. at 89. And it amended the preemption provision in the 1965 Act by adding the following statement: “No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.” Id., 84 Stat. at 88 (codified as amended at 15 U.S.C. § 1334(b)). Congress again amended the Labeling Act by passing the Comprehensive Smoking Education Act, Pub. L. No. 98-474, 98 Stat. 2200 (1984). The Act replaced the warning with a series of warnings that must appear on cigarette packages and advertisements on a rotating basis. Id. § 4, 98 Stat. at 2201-03. The Act also required the Secretary of Health and Human Services to “establish and carry out a program to inform the public of any dangers to human health presented by cigarette smoking.” Id. § 3, 98 Stat. at 2200. The Alcohol and Drug Abuse Amendments of 1983, Pub. L. No. 98-24, 97 Stat. 175, required the Secretary of Health and Human Services to issue a report to Congress every three years on, among other things, “the addictive property of tobacco.” Id. § 2, 97 Stat. at 178. The Comprehensive Smokeless Tobacco Health Education Act of 1986, Pub. L. No. 99-252, 100 Stat. 30, regulates smokeless tobacco products. The Act requires that a warning appear on smokeless tobacco products, id. § 3, 100 Stat. at 30-32, prohibits the advertising of smokeless tobacco products “on any medium of electronic communications subject to the jurisdiction of the Federal Communications Commission,” id. § 3(f), 100 Stat. at 32, and requires the Secretary of Health and Human Services to create a program to inform the public about the health effects of using smokeless tobacco products, id. § 2, 100 Stat. at 30. Last, the ADAMHA Reorganization Act, Pub. L. No. 102-321, 106 Stat. 323 (1992), conditions certain block grants on states making it unlawful “for any manufacturer, retailer, or distributor of tobacco products to sell or distribute any such product to any individual under the age of 18.” Id. § 202, 106 Stat. at 394 (codified at 42 U.S.C. § 300x-26(a)(l)). We do not consider the Family Smoking Prevention and Tobacco Control Act, Pub. L. No. 111-31, 123 Stat. 1776 (2009), because the Act does not affect actions, like the individual Engle actions, that were pending in federal or state court during its passage, id. § 4, 123 Stat. at 1782.
Affording preclusive effect to the Engle jury findings does not frustrate the objectives of these federal laws on tobacco. The only significant requirement imposed on cigarette manufacturers by the six federal laws in question is the warning label requirement for cigarette packages and advertising. Three of the six statutes—the Federal Cigarette Labeling and Advertising Act, the Public Health Cigarette Smoking Act of 1969, and the Comprehensive Smoking Education Act—concern this *1188 warning label. Fittingly, the Labeling Act expressly preempts state laws that would impose labeling requirements. See 15 U.S.C. § 1334; Altria Grp., Inc. v. Good, 555 U.S. 70, 79, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008). The other three statutes impose no significant requirements on cigarette manufacturers: the Comprehensive Smokeless Tobacco Health Education Act of 1986 concerns smokeless products, not cigarettes; the Alcohol and Drug Abuse Amendments imposed a requirement on the Secretary of Health and Human Services to submit reports about cigarettes; and the ADAMHA Reorganization Act conditions block grants to states.
Contrary to R.J. Reynolds and Philip Morris’s argument, the statement of purpose in the Labeling Act, 15 U.S.C. § 1331, does not preserve cigarette sales. The second listed purpose of establishing a program to “deal with cigarette labeling and advertising” states, “[C]ommerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing labeling and advertising regulations.” Id. Congress sought to protect “commerce and the national economy” specifically from the effect of “diverse, nonuniform and confusing cigarette labeling and advertising” rules, id., not from more stringent regulation generally. See Altria Grp., 555 U.S. at 78-79, 129 S.Ct. 538 (explaining that the “Act’s pre-emption provisions promote its second purpose” by preventing States from “enforcing rules that are based on an assumption that the federal warnings are inadequate”); Reilly, 533 U.S. at 542-43, 121 S.Ct. 2404 (paraphrasing the second purpose as “to protect the national economy from interference due to diverse, nonuniform, and confusing cigarette labeling and advertising regulations”); Marotta, 214 So.3d at 599, 2017 WL 1282111, at *7 (“Thus, Congress clearly intended to ‘protect the national economy from the burden imposed by diverse, nonuniform, and confusing cigarette labeling and advertising regulations,’ but did not clearly intend to extend broad immunity from common law liability to cigarette manufacturers.” (citation omitted)).
Nothing in these six statutes reflects a federal objective to permit the sale or manufacture of cigarettes. As a result, we cannot say that Congress created a regulatory scheme that does not tolerate tort liability based on the dangerousness of all cigarettes manufactured by the tobacco companies but tolerates tort actions based on theories with a more limited scope. Cf. Altria Grp., 555 U.S. at 90, 129 S.Ct. 538 (holding that federal law did not preempt common-law fraud claim against cigarette manufacturer based on advertising of light cigarettes); Boerner v. Brown & Williamson Tobacco Co., 394 F.3d 594, 600 (8th Cir. 2005) (holding that the Labeling Act did not preempt design defect claim against cigarette manufacturer); Spain v. Brown & Williamson Tobacco Corp., 363 F.3d 1183, 1197 (11th Cir. 2004) (holding that the Labeling Act did not preempt negligent and wanton design and manufacture claims against cigarette manufacturer). Federal law is silent both by its terms and by its operation.
Determinations of strict liability and negligence based on the Engle findings create no conflict with a federal objective. R.J. Reynolds and Philip Morris do not contend that the Engle jury based its findings of liability on a determination that the warnings on cigarette packages and advertisements were inadequate such that the jury’s findings imposed labeling requirements preempted by federal law. Rules governing the design of cigarettes or even banning the sale of cigarettes do not frustrate accomplishing a rule that requires a certain label when and if cigarettes are sold. See Hunter v. Philip Morr *1189 is USA, 582 F.3d 1039, 1048 (9th Cir. 2009) (explaining that product-liability claim against cigarette manufacturer “does not present an obstacle to the congressional policy concerning the regulation of tobacco” because the federal laws “concern labeling, research and education and do not provide strong evidence of a federal policy against more stringent state regulation”); Marotta, 214 So.3d at 600, 2017 WL 1282111, at *9 (“Strict liability and negligence claims, such as those brought ... under Engle, do not interfere with the regulation of advertising and promotion of cigarettes and, therefore, do not clearly conflict with congressional objectives.”).
That the express-preemption provision in the Labeling Act does not cover the negligence and strict liability findings in Engle supports an inference that there is no implied preemption of those findings. See Wyeth, 555 U.S. at 574-75, 129 S.Ct. 1187; Riegel v. Medtronic, Inc., 552 U.S. 312, 327, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008). Granted, “[i]f a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress’ displacement of state law still remains.” Altria Grp., 555 U.S. at 76, 129 S.Ct. 538; see also Geier v. Am. Honda Motor Co., 529 U.S. 861, 874, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). But, with the Federal Cigarette Labeling and Advertising Act and the Public Health Cigarette Smoking Act of 1969, in Cipollone the Supreme Court interpreted the express-preemption provision as exclusively defining the preemptive scope of the Acts:
In our opinion, the pre-emptive scope of the 1965 Act and the 1969 Act is governed entirely by the express language in § 5 of each Act. When Congress has considered the issue of pre-emption and has included in the enacted legislation a ■ provision explicitly addressing that issue, and when that provision provides a “reliable indicium of congressional intent with respect to state authority,” “there is no need to infer congressional intent to pre-empt state laws from the substantive provisions” of the legislation. Such reasoning is a variant of the familiar principle of expression unius est exclu-sio alterius: Congress’ enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted. In this case, the other provisions of the 1965 and 1969 Acts offer no cause to look beyond § 5 of each Act. Therefore, we need only identify the domain expressly pre-empted by each of those sections.
Cipollone, 505 U.S. at 517, 112 S.Ct. 2608 (citations omitted) (quoting Malone v. White Motor Corp., 435 U.S. 497, 505, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978); Cal. Fed. Sav. & Loan Ass’n v. Guerra, 479 U.S. 272, 282, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987) (plurality opinion)).
The Supreme Court has explained that “in Cipollone, we engaged in a conflict preemption analysis of the Federal Cigarette Labeling and Advertising Act, and found ‘no general, inherent conflict between federal preemption of state warning requirements and the continued vitality of state common-law damages actions.’ ” Freightliner Corp. v. Myrick, 514 U.S. 280, 288-89, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (citation omitted) (quoting Cipollone, 505 U.S. at 518, 112 S.Ct. 2608). Although the Supreme Court considered only the 1965 and 1969 statutes in Cipollone, “[s]ince the Labeling Act’s passage, Congress’s basic goals have remained largely unchanged.” Graham, 782 F.3d at 1277. We find nothing in the four statutes passed later that alters the preemptive scope of federal law on tobacco in a way that is relevant to this appeal.
R.J. Reynolds and Philip Morris argue that, by passing legislation that *1190 does not ban cigarettes, Congress has established a policy of allowing the sale of tobacco products, but this argument is contrary to settled law that inaction by Congress cannot serve as justification for finding federal preemption of state law. See Wyeth, 555 U.S. at 602-03, 129 S.Ct. 1187 (Thomas, J., concurring in the judgment) (collecting cases); Sprietsma v. Mercury Marine, 537 U.S. 51, 65, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002) (“History teaches us that a Coast Guard decision not to regulate a particular aspect of boating safety is fully consistent with an intent to preserve state regulatory authority .... ”); Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 306, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988) (“This Court generally is reluctant to draw inferences from Congress’ failure to act.”). “[OJtherwise, deliberate federal inaction could always imply pre-emption, which cannot be. There is no federal pre-emption in vacuo, without a constitutional text or a federal statute to assert it.” P.R. Dep’t of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 503, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988).
R.J. Reynolds and Philip Morris also rely on the discussion of federal law regulating cigarettes in FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), but that decision does not support their argument for preemption. In Brown & Williamson, the Supreme Court considered whether the Food and Drug Administration had jurisdiction over tobacco products. Id. at 125-26, 120 S.Ct. 1291. The Court held that it did not. Id. at 126, 120 S.Ct. 1291. The Supreme Court reasoned that, if the Administration had jurisdiction, the Food, Drug, and Cosmetic Act would require the administration to remove cigarettes from the market.- Id. at 135, 120 S.Ct. 1291. The Supreme Court considered the six federal statutes that regulate cigarette labeling and concluded that Congress would not have enacted these laws if it intended the Administration to ban cigarettes. See id. at 137-38, 120 S.Ct. 1291. “[T]he collective premise of these statutes is that cigarettes and smokeless tobacco will continue to be sold in the United States.” Id. at 139, 120 S.Ct. 1291. The Supreme Court stated that Congress has “foreclosed the removal of tobacco products from the market” in this context, id. at 137, 120 S.Ct. 1291—surmising that Congress would not have bothered to regulate a product that it intended to have removed from the market nationwide by a federal agency.
Although federal agencies have only the authority granted to them by Congress, states are sovereign. Brown & Williamson does not address state sovereignty, and it does not consider the preemptive reach of federal legislation on tobacco. Marotta, 214 So.3d at 598, 2017 WL 1282111 at *6 (“[W]hile Brown & Williamson held that the FDA did not have the authority to regulate tobacco products, it said nothing about the states’ power to do the same.”). Cipollone does.
State governments retain their historic police powers to protect public health. See U.S. Const. Amend. X. “It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.” New State Ice Co. v. Liebmann, 285 U.S. 262, 386-87, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandéis, J., dissenting). Over a hundred years ago, Tennessee, like some other states, passed a law making it a crime to sell cigarettes. 6 Clark Bell, Medico-Legal Studies 50-65 (1902). Although that experiment in prohibition, like so many others, failed, Tennessee did not violate the federal Constitution. In upholding the law as not infringing the power of Congress under the Commerce Clause, the *1191 Supreme Court described the cigarette ban as the type of legislation that states may enact “for the preservation of the public health or safety” under their police powers. Austin v. Tennessee, 179 U.S. 343, 349, 21 S.Ct. 132, 45 L.Ed. 224 (1900). Today, state and local governments continue to enact public health measures to respond to the dangers associated with smoking, see, e.g., Paul A. Diller, Why Do Cities Innovate in Public Health? Implications of Scale and Structure, 91 Wash. U. L. Rev 1219, 1234-35 (2014) (discussing state and local bans of flavored cigarettes passed before the Tobacco Control Act banned cigarette flavorings); Patrick Kabat, Note, “Till Naught but Ash is Left to See”: Statewide Smoking Bans, Ballot Initiatives, and the Public Sphere, 9 Yale J. Health Pol’y L. & Ethics 128, 138-45 (2009) (surveying state prohibitions of smoking in public places), and to combat other public health risks, see, e.g., Cal. Health & Safety Code § 114377 (banning certain trans fats); N.Y. State Rest. Ass’n v. N.Y.C. Bd. of Health, 556 F.3d 114 (2d Cir. 2009) (upholding New York City law requiring caloric disclosure on chain restaurant menus against preemption challenge); Trans Fat and Menu Labeling Legislation, Nat’l Conference of State Legislatures (Jan. 2013), http://www.ncsl. org/research/health/trans-fat-and-menu-labeling-legislation.aspx (all Internet materials as visited July 9, 2016, and available in Clerk of Court’s ease file) (listing six states that had enacted menu labeling legislation as of 2010).
Florida may employ its police power to regulate cigarette sales and to impose tort liability on cigarette manufacturers. We may not supersede the “historic police powers of the States” unless it is the “clear and manifest purpose of Congress.” Wyeth, 555 U.S. at 565, 129 S.Ct. 1187 (quoting Lohr, 518 U.S. at 485, 116 S.Ct. 2240). And “[t]hat assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States,” Altria Grp., 555 U.S. at 77, 129 S.Ct. 538, like public health, Lohr, 518 U.S. at 475, 116 S.Ct. 2240.
R.J. Reynolds and Philip Morris would have us presume that Congress established a right to sell cigarettes based on a handful of federal labeling requirements. We decline to do so. We discern no “clear and manifest purpose” to displace tort liability based on the dangerousness of all cigarettes manufactured by the tobacco companies.
IY. CONCLUSION
We AFFIRM the judgments against R.J. Reynolds and Philip Morris.