[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 15-15633; 16-15957
_____

D.C. Docket No. 3:09-cv-14157-WGY-HTS

BERNARD COTE, the Personal Representative of the
Estate of Judith Berger,

Plaintiff – Appellee
Cross Appellant,

versus

R.J. REYNOLDS TOBACCO COMPANY, et al.,

Defendants,

PHILIP MORRIS USA, INC.,

Defendant – Appellant
Cross Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(November 26, 2018)

Before WILSON and NEWSOM, Circuit Judges, and WRIGHT,[*] District Judge.

WRIGHT, District Judge:

Plaintiff Judith Berger ("Mrs. Berger")[1] sued Philip Morris USA, Inc. ("Philip Morris") for intentional and unintentional torts, seeking compensatory and punitive damages for smoking-related injuries. After a nine-day, bifurcated trial, a jury found for Mrs. Berger on all claims and awarded compensatory and punitive damages. Following the verdict, the district court ruled on multiple post-trial motions, and the parties appeal several of those rulings. Philip Morris appeals denial of its motion for a new trial, asserting improper closing argument, and denial of its renewed motion for judgment as a matter of law ("JMOL") on all claims, asserting federal preemption and due process arguments. Mrs. Berger cross appeals, arguing that the district court erred in granting Philip Morris's renewed motion for JMOL as to her intentional tort claims and vacating the related punitive-damages award.

After thorough review, and with the benefit of oral argument, we affirm the district court's denial of Philip Morris's motion for a new trial and motion for

---

[*]Honorable Susan Webber Wright, United States District Judge for the Eastern District of Arkansas, sitting by designation.

[1] On March 30, 2017, while this appeal was pending, Mrs. Berger died. Pursuant to Federal Rule of Appellate Procedure 43(a), this Court approved the substitution of Bernard Cote, the personal representative of Mrs. Berger's estate, in Mrs. Berger's place. For the sake of clarity, however, we continue to refer to Mrs. Berger as the Appellee/Cross-Appellant.

2

JMOL on all claims; we reverse the district court's grant of JMOL as to intentional tort claims, and conditional grant of a new trial on those claims; and we reinstate the punitive-damages award.

## I.  BACKGROUND

### A.  The *Engle* Litigation

This is one of thousands of "*Engle*-progeny" cases that flow from a Florida class action filed in 1994 against major domestic cigarette manufacturers, including Philip Morris.[2]  The named plaintiffs in that case sought damages for smoking-related injuries under theories including negligence, strict liability, fraud, and conspiracy to commit fraud, and the case proceeded in phases.  Phase I consisted of a year-long trial during which the plaintiffs presented evidence that the defendants, for decades, had engaged in advertising campaigns aimed at attracting young smokers, while intentionally deceiving consumers about the health dangers of smoking and the addictive qualities of nicotine.[3]  *See Engle v. RJ*

---

[2]  For a thorough history of the *Engle* litigation, see *Graham v. R.J. Reynolds Tobacco Co*., 857 F.3d 1169, 1174–81 (11th Cir. 2017) (en banc).

[3] The *Engle* trial court recounted a portion of the Phase I evidence as follows:

> From the early years of advertising up until July of 1969, defendants engaged in concerted advertising campaigns extolling the virtues of smoking and making references to the lack of health risks and stressing the alleged benefits of smoking. References were made to Doctors smoking with no ill effects, to Radio and Television stars like Arthur Godfrey, and to sports figures, all of whom smoked and hawked the health benefits of tobacco or lack of health risks.  All the while the defendants knew by their own research and the work of others, that cigarettes were carcinogenic and caused cancer and other deadly diseases.  Defendants reneged on

*Reynolds Tobacco*, No. 94-08273 CA-22, 2000 WL 33534572 at *2 (Fla. Cir. Ct. Nov. 6, 2000).

Phase I produced multiple jury findings, hereinafter "Phase I findings," that favored the plaintiffs.  The threshold findings resolved the question of general causation, specifically that smoking cigarettes causes multiple enumerated diseases and that nicotine in cigarettes is addictive.  Additional Phase I findings focused on the defendants' conduct, including the following:

- the defendants placed cigarettes on the market that were defective and unreasonably dangerous;

- the defendants concealed or omitted material information, not otherwise known or available, knowing that the material was false or misleading, or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes, or both;

- the defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment; and

- the defendants were negligent.

---

their promises contained in the Frank Statement of 1954, and never revealed to the public the addictive nature of tobacco-a fact they all recognized but never admitted. Even after 1969, defendants continued campaigns of misinformation about the dangers of smoking and fostered the myth that there was a continuing controversy about causation in face of the overwhelming contrary body of evidence worldwide. Not only was there misinformation supplied by defendants, there was concealment of known information which affected the health of the public at large.

*Engle v. RJ Reynolds Tobacco*, No. 94-08273 CA-22, 2000 WL 33534572, at *2 (Fla. Cir. Ct. Nov. 6, 2000).

*Philip Morris USA, Inc. v. Douglas*, 110 So. 3d 419, 424–25 (Fla. 2013) (quoting

*Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246, 1276-77 (Fla. 2006)).

The Supreme Court of Florida eventually decertified the *Engle* class action,

finding that individualized issues such as legal causation, comparative fault, and

damages could not be resolved on a class-wide basis. *See Engle,* 945 So.2d at

1268-69. Important to this case, the court also held that the Phase I findings listed

above could be utilized by class members in future cases, now known as *Engle-*

progeny cases, for the recovery of individual damages. *See id.* at 1269.

## B. This Case

Mrs. Berger, a forty-year smoker diagnosed with chronic obstructive

pulmonary disease (COPD), brought this suit against Philip Morris, claiming to be

an *Engle* class member entitled to the benefit of Phase I findings.[4] Mrs. Berger

sued under theories of strict liability, negligence, fraudulent concealment, and

conspiracy to fraudulently conceal.

By the time of trial in September 2014, Mrs. Berger had reached the end

stage of lung disease, and she depended on supplemental oxygen and a wheelchair.

The first phase of the trial focused on questions of class membership, liability and

compensatory damages, allocation of fault, and whether Mrs. Berger was entitled

---

[4] The case began as a multi-plaintiff action in Florida state court, which the defendants removed
to the Middle District of Florida, where individual cases proceeded to trial.

5

to punitive damages with respect to her intentional tort claims.[5]  The evidence established that she had developed COPD on or before November 21, 1996 and that her addiction to cigarettes containing nicotine was the cause of her lung disease—facts that qualified her as a member of the *Engle* class, entitled to the benefit of Phase I findings.

Like the Phase I jurors in the original *Engle* litigation, the jurors in this case heard extensive evidence that beginning in the early 1950's and for decades that followed, Philip Morris and other tobacco companies engaged in a massive and effective disinformation campaign, aimed at instilling false doubt about scientific research linking cigarette smoking and deadly disease.  In a post-trial order, the district court commented:

> [T]here was ample evidence that the tobacco companies engaged in a massive, multi-faceted, protracted, and effective disinformation campaign.  Mrs. Berger's counsel aptly demonstrated the effect of that campaign in his closing argument, to wit: "[W]hat we've got here and what Philip Morris and this industry is doing is worse because there's the truck driver, foot on the gas, about to go, looks out the window at the guy about to cross the street and goes, come on, come on; that's the conduct we have."

---

[5]  The district court instructed the jury that it could consider punitive damages only with respect to Mrs. Berger's claims for fraudulent concealment and conspiracy to fraudulently conceal.  At the time, the district court's instruction was consistent with Florida law, *see Soffer v. R.J. Reynolds Tobacco Co.*, 106 So. 3d 456 (Fla. 1st DCA 2012), which precluded *Engle*-progeny plaintiffs from seeking punitive damages on negligence and strict liability claims, even though such damages would normally be available under Florida law.  Subsequently, the Florida Supreme Court declared that *Engle*-progeny plaintiffs "are not prevented from seeking punitive damages on all claims properly raised in their subsequent individual actions."  *Soffer v. R.J. Reynolds Tobacco Co.*, 187 So. 3d 1219, 1221 (Fla. 2016).

With her own testimony, Mrs. Berger told jurors about her personal background and life as a smoker. Born in 1944, she was raised in Brooklyn, New York, and lived with her parents and two sisters. Mrs. Berger and her identical twin sister, Josephine, were especially close throughout their lives and were rarely apart. In 1958, at thirteen, "going on fourteen," Mrs. Berger tried her first cigarette. She recalled that she was in a park with friends and that "all of the kids smoked," including Josephine. Initially, Mrs. Berger feigned smoking by holding the smoke in her mouth and exhaling, but other kids noticed what she was doing and made fun, and a friend named Anita Russo taught her to inhale.

For the first few years, Mrs. Berger took only two or three cigarettes a day from friends, but by sixteen, she was purchasing and smoking a pack a day. She hid her smoking from her parents, who did not approve of the habit. When Mrs. Berger was sixteen, her father caught her smoking and told her that he disapproved because he had observed women, who he believed were prostitutes, walk the streets while smoking. Mrs. Berger never smoked in the presence of her father, who died in 1972, and when she smoked in front of her mother, who detested cigarette smoke, she did so outside.

In her high school years, Mrs. Berger was free to smoke on school grounds, at the local hangout (Cozy's Corner), and at a luncheonette where she and Josephine held part-time jobs. She observed teachers smoke, including her gym

7

teacher, and she noticed that her own doctor and all movie stars smoked.

Throughout her teen years, Mrs. Berger observed cigarette advertisements on

billboards, trains, buses, and television. She testified that cigarette ads were so

pervasive that people "took it for granted," and "it was like having a hamburger."

She recalled an ad featuring the Marlboro Man, "a good-looking guy on a horse

smoking," which in her mind, portrayed that "[smoking] wasn't that bad, . . . it was

okay."

At twenty, Mrs. Berger smoked a pack and a half per day. At twenty-one,

she married her husband, Paul, also a smoker. After Mrs. Berger married, she

stopped buying cigarettes by the carton, with the idea that she would smoke less if

she purchased only two packages a day. But when she ran out of cigarettes, she

would leave the house at any hour to replenish her supply, and on occasion, she

resorted to smoking butts left in ashtrays.

As a teen, Mrs. Berger knew nothing about nicotine. She remembered

reading the Surgeon General's warning on cigarette packages that appeared in

1966, when she was twenty-two, and recalled the exact wording: "Cigarette

smoking may be hazardous to your health." She testified that at the time, she and

her friends thought "they weren't sure" about the health hazards associated with

cigarettes, and "they were speculating." She testified that nobody took the warning

8

seriously because "[t]hey were working on it, but it wasn't a sure thing yet," and that she knew people in their nineties who were still smoking.

In the late 80's, Mrs. Berger realized that she had become a slave to cigarettes. She attempted to kick the habit several times and tried smoking cessation aides, but with no success. On one occasion, she and her sister Josephine were sitting in a doctor's office, waiting for flu shots, when a man using supplemental oxygen walked in. Josephine commented that unless they quit smoking, they too would "wind up like that," and each sister wagered $50 that she would be the first to stop smoking. Neither sister won the bet. In 1995, Josephine was diagnosed with emphysema, and she pleaded with her sister to stop smoking. Mrs. Berger again tried to stop smoking but had only limited success in that she decreased her consumption and refrained from smoking while caring for Josephine. In 1998, Mrs. Berger was diagnosed with COPD, and she finally stopped smoking.

Mrs. Berger testified that she could not remember an instance where a specific advertisement caused her to choose a cigarette brand, but she thought that cigarette ads nonetheless influenced her smoking habits. On direct examination, when asked why she believed that cigarette ads influenced her, she replied, "Well, I went to lights because I thought they were not as strong as the regular cigarettes." On cross-examination, however, Mrs. Berger readily acknowledged that she switched to light cigarettes because "they weren't as harsh," meaning the taste was

milder than regular cigarettes, and that she did not make the switch because she thought that lights were better for her health. She testified, "No, to me they were all the same." Mrs. Berger also recognized that she switched to filtered cigarettes to avoid having tobacco in her mouth, that she preferred recessed filters because the filter was less prominent, and that she started smoking solely because of peer pressure.

## C.  The Verdict, Post-Trial Motions, and Issues on Appeal

After deliberations, the jury found that Mrs. Berger qualified as a member of the *Engle* class, found in her favor on all claims, and awarded her $6.25 million in compensatory damages. Jurors also found that Mrs. Berger was 40% at fault (which reduced compensatory damages to $3.75 million) and that she was entitled to punitive damages with respect to the intentional tort claims. The trial then proceeded to a second phase, where the jury determined that Mrs. Berger was entitled to $20,760,000.14 in punitive damages.

After trial, Philip Morris filed two renewed motions for JMOL, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. The first renewed motion sought to undo the jury's verdicts on all claims on grounds that giving Phase I findings preclusive effect violated the Due Process Clause and federal preemption principles. The second renewed motion sought JMOL only on the fraudulent concealment and conspiracy-to-conceal claims on grounds that Mrs. Berger had

10

failed to prove detrimental reliance.  In the alternative, Philip Morris sought a new trial on the intentional tort claims.  Philip Morris also moved for a new trial or remittitur, setting forth several arguments, including that opposing counsel made improper closing arguments that stoked the passions of the jury and impaired dispassionate consideration of the case.

The district court rejected Philip Morris's due process and federal preemption arguments and denied its motion for a new trial or remittitur but found that Mrs. Berger's own testimony negated a finding of detrimental reliance, a required element of her intentional tort claims.  Given these findings, the district court granted Philip Morris's renewed motion for JMOL as to fraudulent concealment and conspiracy to fraudulently conceal and conditionally granted Philip Morris's alternative motion for a new trial on those claims.  The district court also vacated the punitive damages award and left intact the jury's negligence and strict liability verdicts and compensatory damage award.

On appeal, Philip Morris argues that the district court erred in denying its motion for a new trial, based on improper closing argument by counsel, and its renewed JMOL motion on all claims, based on due process and preemption arguments.  Mrs. Berger cross appeals, arguing that the district court erred by granting JMOL in Philip Morris's favor as to fraudulent concealment and

conspiracy to fraudulently conceal and by vacating the related, punitive damages award.

## II.  STANDARDS OF REVIEW

Three standards govern our review.  First, we review the district court's denial of Philip Morris's motion for a new trial based on allegedly improper closing argument under the deferential, abuse-of-discretion standard.  *See Lanham v. Whitfield*, 805 F.2d 970, 972 (11th Cir. 1986) (citing *Brown v. Arlen Mgmt. Corp.*, 663 F.2d 575 (5th Cir. 1981)).  We consider "the entire argument, the context of the remarks, the objection raised, and the curative instruction to determine whether the remarks were 'such as to impair gravely the calm and dispassionate consideration of the case by the jury.'"  *Allstate Ins. Co. v. James,* 845 F.2d 315, 318 (11th Cir.1988) (quoting *Spach v. Monarch Ins. Co.,* 309 F.2d 949, 953 (5th Cir. 1962)).  We keep in mind that "[t]he power to set aside a jury verdict for misconduct of counsel is a procedural question that is governed by federal law," *Allstate Ins. Co.,* 845 F.2d at 318, which gives the trial judge "considerable discretion to control the tone of counsels' arguments and, absent an abuse of discretion, the decision of the trial court, which has had the opportunity to hear the offensive remarks within the context of the argument and to view their effect on the jury, should not be disturbed." *Id.*

Second, we review the district court's grant of Philip Morris's motion for JMOL, as to intentional tort claims, *de novo*, applying the same standard as the district court. *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1275 (11th Cir. 2008) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997)). "We consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party." *Bagby Elevator Co.*, 513 F.3d at 1275 (internal quotation marks and citations omitted). And we "disturb the jury's verdict only when there is no material conflict in the evidence, such that no reasonable person could agree to the verdict reached." *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285 (11th Cir. 2014) (citing *Bagby Elevator Co.*, 513 F.3d at 1275)).

Third, we review the district court's grant of a new trial on intentional tort claims for abuse of discretion, *Lambert v. Fulton County, Ga.,* 253 F.3d 588, 595 (11th Cir. 2001), keeping in mind that, "'new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence.'" *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984) (quoting *Conway v. Chem. Leaman Tank Lines, Inc.,* 610 F.2d 360, 363 (5th Cir.1980)).

## III.   DISCUSSION

**A.  The District Court Properly Denied Philip Morris's Motion for a New Trial Based on Improper Closing Argument**

Philip Morris argues that in closing arguments, opposing counsel made three types of inflammatory, prejudicial comments that require a new trial: (1) comments that compared it to a child predator; (2) comments that improperly disparaged its defense against Mrs. Berger's claims; and (3) comments that improperly injected counsel's opinion.

*Comments Comparing Philip Morris to a "Child Predator."*  In closing rebuttal, plaintiff's counsel addressed defense counsel's observation that Mrs. Berger smoked despite her father's disapproval:

> They bring up this thing about her dad and how clear it was to her [that he disapproved of smoking].  You know, if a child--we tell our children a lot of things not to do. . . .  You know, when a kid -- if a kid takes a piece of candy from a stranger and then goes and gets hurt, you know, because mommy and daddy told them don't ever accept candy from a stranger, and then it happens, and they go get hurt--

At this point, Philip Morris objected and in bench conference, argued that counsel was comparing it to pedophiles and criminals.  The Court overruled the objection without comment.  Mrs. Berger's attorney continued:

> The kid accepts candy from a stranger and then gets hurt.  Okay?  We don't blame that kid because they didn't listen to mommy and daddy; we blame the party that deserves the blame.

14

We find that counsel's rebuttal argument was a fair response to the argument that Mrs. Berger smoked even after her father caught her smoking and expressed his disapproval. Contrary to Philip Morris's portrayal, counsel's use of the don't-take-candy-from-a-stranger adage did not of necessity suggest child predation or pedophilia. Furthermore, to constitute reversable error, statements made in oral argument must be "plainly unwarranted and clearly injurious." *Peterson v. Willie*, 81 F.3d 1033, 1036 (11th Cir. 1996). Jurors heard extensive evidence that Philip Morris and its co-conspirators, knowing that nicotine cigarettes were addictive and harmful, deliberately targeted and encouraged school-age children to start smoking. Given such evidence, it is most unlikely that counsel's rebuttal argument altered jurors' assessment of Philip Morris.

*Comments Critical of Philip Morris's Defense.* Philip Morris contends that opposing counsel's remarks improperly disparaged its defense of the case by (1) arguing that Philip Morris was trying to "rewrite history," (2) referring to Philip Morris's evidence as "distraction science," and (3) stating that Philip Morris would "do anything to create doubt."

We find that the district court properly overruled Philip Morris's objection to counsel's "rewrite history" comment, which was no more than a general remark about defense strategy. As for the passing reference to "distraction science," Philip Morris contends that counsel was suggesting that Philip Morris was perpetuating in

15

the courtroom the same disinformation campaign that gave rise to Mrs. Berger's claims. During a lengthy bench conference, the district court overruled the objection but instructed counsel to "make clear that you were talking about past history and conduct that the defendant engaged in the past." Thereafter, Mrs. Berger's counsel suspended all mention of "distraction science." In sum, it is far from clear that counsel's brief reference to "distraction science" injured the defense to any degree. Finally, the district court sustained Philip Morris's objection to counsel's comment that Philip Morris would "do anything to create doubt," and instructed the jury to ignore counsel's comment. We find that the district court's curative instruction mitigated any possible prejudicial interpretation by the jury.

*Comments Injecting Personal Opinion.* Philip Morris argues that counsel improperly voiced personal opinions, including, "I don't think that's a lot to ask in this country: to make products as safe as possible," and a comment that it was "sick" and "disgusting" that Philip Morris introduced Nicorette gum only after smokers had become ill. Although counsel has a duty to refrain from providing personal commentary, potentially prejudicial remarks "may be rendered harmless by a curative instruction." *United States v. Iglesias*, 915 F.2d 1524, 1529 (11th Cir. 1990) (citing *United States v. Reed,* 887 F.2d 1398, 1402 (11th Cir.1989)). Here, immediately after counsel made the comments at issue, Philip Morris

16

objected and without hesitation, the district court reminded jurors that they were bound to decide the case on the evidence, not the personal observations of counsel. Given the district court's curative instruction, we find no prejudice.

**B.  This Court's Precedent Requires Rejection of Philip Morris's Due Process and Preemption Arguments.**

In its opening brief, Philip Morris sought to preserve its position on two additional issues: (1) whether the use of Phase I findings to prove elements of *Engle*-progeny claims violates due process and (2) whether the use of Phase I findings to prove elements of *Engle*-progeny nonintentional tort claims is preempted by federal law.  Philip Morris acknowledged that these questions had been decided against it by this Court's decision in *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1183–86 (11th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 636 (2018), where we held that treating the *Engle* jury findings on negligence and strict liability as *res judicata* did not violate due process and that "federal tobacco laws do not preempt state tort claims based on the dangerousness of all the cigarettes manufactured by the tobacco companies."  *Graham*, 857 F.3d at 1186.  In its reply brief, however, Philip Morris presented an additional argument: that use of the Phase I findings as to fraudulent concealment and conspiracy claims violates due process because those findings, worded in the disjunctive, do not specify whether the Phase I jury determined that the defendants

17

concealed material information about the health effects of cigarettes or, instead, the addictive nature of cigarettes.

After the close of briefing, this Court held in *Burkhart v. R.J. Reynolds Tobacco Co.*, 884 F.3d 1068, 1091–93 (11th Cir. 2018) that due process is not violated by applying preclusive effect to Phase I fraudulent concealment and conspiracy findings in an *Engle*-progeny action. And more recently, when presented with arguments identical to those asserted by Philip Morris here, this Court held: "Because we are bound to follow precedent, the *Burkhart* decision therefore ends any debate in this court as to whether the *Engle* jury findings related to the concealment claims are to be given preclusive effect. The answer is: they will." *Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1354 (11th Cir. 2018). In sum, our precedent holds, categorically, that use of Phase I findings to establish *Engle*-progeny tort claims is constitutionally permissible, and we must therefore reject Philip Morris's arguments.

## C.  The District Court Erred in Granting Philip Morris's Renewed Motion for JMOL and Alternative Motion for a New Trial as to Intentional Tort Claims and Vacating the Related Punitive Damages Award

Phase I findings, which the jury was required to accept, established that Philip Morris engaged in conduct that subjected the company to liability for

18

fraudulent concealment and conspiracy to fraudulently conceal.[6]  Given the conclusive findings about fraudulent conduct, the only questions remaining were whether Mrs. Berger had relied to her detriment on the material information that Philip Morris and other defendants had concealed about the health effects and/or addictive nature of smoking and, if so, whether her reliance was a legal cause of her COPD.  The district court instructed the jury accordingly, and in answer to interrogatories, the jury found that Mrs. Berger had so relied and that her reliance was a legal cause of her COPD.

The district court granted judgment to Philip Morris on the concealment claims because it found that Mrs. Berger's own testimony that she started smoking due to peer pressure and that she chose her cigarette brand and type based on

---

[6]  Florida law prescribes the following elements for a fraudulent concealment claim: (1) the defendant concealed or failed to disclose a material fact; (2) the defendant knew or should have known the material fact should be disclosed; (3) the defendant knew that its concealment of or failure to disclose the material fact would induce the plaintiff to act; (4) the defendant had a duty to disclose the material fact; and (5) the plaintiff detrimentally relied on the misinformation.  *See Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 691 (Fla. 2015) (citations omitted).  A claim for conspiracy to fraudulently conceal requires proof that the defendant and others agreed to do an unlawful act or to do a lawful act by unlawful means, an overt act was done to further the conspiracy, and the plaintiffs were damaged as a result.  *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1068 (Fla. 1st DCA 2010) (citations omitted).

The Phase I findings conclusively established that Philip Morris and other tobacco companies "concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both" and "agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment."  *Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246, 1277 (Fla. 2006).

19

personal preferences, not health considerations, overcame any evidence that would fairly support an inference of detrimental reliance.  The district court stated its conclusion as follows:

> Here, there is but little evidence that Mrs. Berger was aware of the false disinformation and even less evidence that she acted or refrained from action due to it.  To be sure, Mrs. Berger thought that the question of smoking's addictive effects and risks to health was uncertain and the basis for the Surgeon General's warnings, which she admitted ignoring, was speculative.  *This testimony fairly gives rise to an inference that the disinformation affected her smoking-related decisions*.
>
> Those inferences are, however, insufficient to support the verdict in light of Mrs. Berger's own explicit testimony.  Though she was aware of the Surgeon General's warnings and was under the impression that the science relating to health risks appeared in dispute and uncertain, her testimony failed to connect, and even served to disconnect, her ensuing decisions with the companies' false pronouncements about those issues.

*Berger v. Philip Morris USA, Inc.*, 101 F. Supp. 3d 1228, 1242 (M.D. Fla. 2015) (emphasis added).

We apply the federal standard to assess whether the evidence presented at trial was sufficient to raise a question of fact for the jury, but state law supplies the substantive law that we apply in this diversity case.[7]  *See generally Erie R.R. Co. v.*

---

[7]  In interpreting Florida law, we look first to precedent from the Florida Supreme Court.  If there is no such precedent, we adhere to decisions of Florida's intermediate appellate courts absent some persuasive indication that the Florida Supreme Court "would decide the issue otherwise." *Winn–Dixie Stores, Inc. v. Dolgencorp, LLC,* 746 F.3d 1008, 1021 (11th Cir. 2014) (internal quotation marks omitted).

20

*Tompkins,* 304 U.S. 64, 58 S. Ct. 817 (1938); *see also ABC-Paramount Records, Inc. v. Topps Record Distrib. Co.*, 374 F.2d 455, 460 (5th Cir. 1967).  A recent *Engle*-progeny decision, *Philip Morris USA, Inc. v. Duignan*, 243 So. 3d 426, 441 (Fla. 2d DCA 2017), issued after the district court's post-trial decisions, provides a comprehensive review of Florida's fraudulent concealment law as it relates to *Engle*-progeny cases.  Using hypothetical fact patterns, *Duignan* aptly illustrates that the type of evidence required to prove detrimental reliance necessarily depends on the facts underlying a fraud claim.  For example, a claim involving an affirmative misrepresentation calls for evidence that the plaintiff relied to her detriment on the fact that the misstatement conveyed.  *See Duignan*, 243 So. 3d at 440.  But where fraudulent conduct involves omitted or concealed information and "the use of an artifice to throw the other party off his guard and lull him into a false sense of security," the link between the defendant's conduct and the plaintiff's misapprehension is less direct and does not necessarily depend upon reliance on a statement.  *See Duignan*, 243 So. 3d at 439-40 (quoting *Joiner v. McCullers*, 28 So. 2d 823, 824–25 (Fla.  1947)).  In such cases, the decisive question is:  whether the plaintiff would have behaved the same way had she known the true facts. *Duignan*, 243 So. 3d at 439 (citations omitted) (explaining that "the cases' use of the formulation 'detrimental reliance on a statement' or something similar should not obscure the nature of the inquiry: when we ask about detrimental reliance, we

21

are asking whether the plaintiff would have behaved in the same way had he known the true facts").

Engle-progeny concealment claims arise from a long-lived, sustained effort to hide the truth about the health hazards of smoking.  In recounting the evidence presented in this case, the district court noted that at thirteen going on fourteen, Mrs. Berger was "entirely typical of those whom tobacco companies deliberately targeted as prospective customers."  The district court explained:

> Tobacco companies knew they needed to gain new customers when they were young, as those who were non-smokers by their twenties would, in all likelihood, never become their customers.  Tobacco companies consequently deliberately targeted persons of school and college age to begin smoking, knowing that, as a result of the addictive powers of their product, and the oft irresistible influence of peer pressure on pupils and students, they would acquire new, life-long consumers of their products.

> Most of those new customers could not and did not know, of course, that they would be reducing their life expectancy, on average, by ten years, and, in any event, exposing themselves to a host of incapacitating and deadly cigarette-caused diseases.  By the 1950s and 1960s the tobacco companies joined and often collusively acted to conceal those consequences, despite their own knowledge of the addictive and deadly effects of their products.

Berger, 101 F. Supp. 3d at 1232, 1232 n.4.

Recognizing the unique circumstances underlying Engle-progeny fraudulent concealment claims, Florida courts have consistently held that Engle-progeny plaintiffs are not required to show reliance on a specific statement.  See Philip Morris USA Inc. v. McCall, 234 So. 3d 4, 14 (Fla. 2d DCA 2017) (explaining that

22

in an *Engle* case, a fraudulent concealment claim need not be limited to reliance on a statement); *Duignan*, 243 So. 3d at 439 (holding that an *Engle*-progeny plaintiff was not required to prove detrimental reliance on a statement); *Martin*, 53 So. 3d, at 1069 (finding "abundant evidence from which the jury could infer . . . reliance on pervasive misleading advertising campaigns . . . and on the false controversy created by the tobacco industry during the years he smoke aimed at creating doubt among smokers that cigarettes were hazardous to health). Instead, Florida law permits an *Engle*-progeny jury to infer reliance based on evidence that the plaintiff was exposed to the disinformation campaign and harbored a misapprehension about the health effects and/or addictive nature of smoking. *See Duignan*, 243 So. 3d at 442 (citing *Philip Morris USA, Inc. v. Hallgren*, 124 So. 3d 350, 353 (Fla. 2d DCA 2013); *Evers v. R.J. Reynolds Tobacco Co.*, 195 So. 3d 1139, 1141 (Fla. 2d DCA 2015); *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1069–70 (Fla. 1st DCA 2010)). If the plaintiff makes this showing, the burden of proof shifts and requires the defendant to "show otherwise." *Duignan*, 243 So. 3d at 442 (citing *Evers v. R.J. Reynolds Tobacco Co.*, 195 So. 3d 1139, 1141 (Fla. 2d DCA 2015).

Our federal standard of review and Florida substantive law prescribing the type of evidence sufficient to raise an inference of detrimental reliance are compatible and together provide the proper analytical framework for the question before us: Whether, considering all evidence and drawing all reasonable inferences

23

in favor of Mrs. Berger, any reasonable juror could have inferred that she was exposed to Philip Morris's decades-long, pervasive disinformation campaign and was accordingly confused regarding the health effects or addictive nature of smoking cigarettes such that she may have behaved differently had she known the true facts.

In this case, jurors heard evidence about the tobacco industry's sustained and pervasive disinformation campaign, Mrs. Berger's exposure to ads that imparted the notion that smoking "wasn't that bad," Mrs. Berger's unawareness early on about the addictive power of nicotine, and her impression that the Surgeon General's warning was based on speculation. Additionally, Mrs. Berger testified that she made multiple unsuccessful attempts to stop smoking before her 1998 diagnosis, even resorting to nicotine gum and "waiting for some miracle" that never happened. With this evidence, any reasonable juror could have inferred that Mrs. Berger might have never started smoking or would have quit smoking earlier if she had known the true facts about the health effects and/or addictive nature of smoking. Contrary to the district court's view, we find that Mrs. Berger's testimony that peer pressure influenced her decision to start smoking and that she chose her cigarette brand and type based on personal preferences did little to rebut the reasonable inference that Philip Morris's disinformation campaign confused

24

her understanding about the health hazards of smoking to her detriment.[8]  Even if

Mrs. Berger started smoking solely as a result of peer pressure, and then

subsequently chose her cigarettes based solely on personal preferences, a

reasonable juror could have concluded that if she had known the whole truth about

the risks of smoking, she would have quit.  We therefore find that the district court

erred in granting Philip Morris's renewed motion for JMOL.

In accordance with Federal Rule of Civil Procedure 50(c)(1), the district

court ruled on Philip Morris's alternative motion for a new trial, and it

conditionally granted a new trial on the intentional tort claims.  In granting the

motion, the district court referred to the erroneous conclusion that Mrs. Berger's

testimony provided "direct evidence that she did not rely to her detriment on

incomplete representations regarding the health effects and/or addictive nature of

smoking cigarettes." *Berger,* 101 F. Supp. 3d, at 1244.  As we have explained,

Mrs. Berger presented ample evidence to support an inference of detrimental

---

[8]  In a footnote set forth in its reply brief and answer on cross-appeal, Philip Morris suggests that even if Mrs. Berger had adduced evidence establishing reliance, she failed to adduce evidence that such reliance was detrimental.  This cursory statement is not sufficient to "plainly and prominently" raise the issue on appeal. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) (quoting *United States v. Jernigan,* 341 F.3d 1273, 1283 n.8 (11th Cir. 2003)).  We note additionally that jurors heard testimony from Dr. Thomas Gravely, a pulmonologist, who explained that smoking causes accelerated loss of lung function over time, and the amount of lung function saved from smoking cessation decreases as a smoker ages.  He testified: "At any point should you make a decision to stop smoking and at the same time be able to quit—sometimes it's very difficult—then over time the accelerated loss stops, but you don't go back to normal."

reliance, and Philip Morris presented no counterbalancing evidence. Accordingly, we find that the district court erred in conditionally granting Philip Morris's alternative motion for a new trial on intentional tort claims.

## IV.  CONCLUSION

For the reasons stated, we AFFIRM the district court's denial of Philip Morris's motion for a new trial based on improper closing argument, we AFFIRM the district court's denial of Philip Morris's renewed motion for JMOL on all claims based on due process and preemption principles, and we REVERSE the district court's grant of Philip Morris's renewed motion for JMOL on intentional tort claims. We also REVERSE the district court's decision to conditionally grant Philip Morris's alternative motion for a new trial on intentional tort claims. We REMAND the case to the district court for the entry of judgment in Plaintiff's favor on claims for fraudulent concealment and conspiracy to fraudulently conceal and for reinstatement of the jury's corresponding punitive damages award.

**AFFIRMED IN PART, REVERSED IN PART, REMANDED IN PART.**