[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 15-13160

_____

DONNA BROWN,

Plaintiff-Appellee,

*versus*

R.J. REYNOLDS TOBACCO COMPANY,
individually and as successor by merger to the Brown
and Williamson Tobacco Corporation and the American
Tobacco Company, et al.,

Defendants,

PHILIP MORRIS USA, INC.,

2                   Opinion of the Court                15-13160

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:09-cv-10687-WGY-HTS

_____

Before JORDAN, TJOFLAT, Circuit Judges, and BEAVERSTOCK,[*] Chief District Judge.

TJOFLAT, Circuit Judge:

In this *Engle*-progeny[1] case, Donna Brown, a lifelong smoker, sued Philip Morris USA, Inc.,[2] seeking damages for the injuries she sustained as a result of smoking Philip Morris's cigarettes, specifically her development of peripheral vascular disease

_____

[*] The Honorable Jeffrey U. Beaverstock, United States District Judge for the Southern District of Alabama, sitting by designation.

[1] *Engle v. Liggett Grp., Inc.* (*Engle III*), 945 So. 2d 1246 (Fla. 2006).

[2] Brown initially sued Philip Morris, R.J. Reynolds Tobacco Company, and Lorillard Tobacco Company, in a six-count complaint alleging negligence, strict liability, fraudulent concealment, conspiracy to fraudulently conceal, breach of express warranty, and breach of implied warranty. The parties stipulated to the dismissal of the warranty claims prior to trial. And Brown and both R.J. Reynolds and Lorillard eventually jointly moved to dismiss the claims against R.J. Reynolds and Lorillard with prejudice, which were granted.

("PVD"), a debilitating disease which eventually required the amputation of both of her legs, among other injuries. A jury returned verdicts against Philip Morris for Brown's claims for strict liability, negligence, fraudulent concealment, and conspiracy to fraudulently conceal, and awarded Brown $8,287,448 in compensatory damages and $9 million in punitive damages.

This appeal turns on whether Brown presented sufficient evidence of her fraud claims. Philip Morris appeals the District Court's denial of its renewed motion for judgment as a matter of law on the fraud claims, arguing that Brown presented insufficient evidence to show that she relied to her detriment on statements made by Philip Morris that concealed material information about the health effects or addictive nature of smoking, or that such reliance was a legal cause of her smoking-related disease. Brown defends the District Court's ruling, and the jury's verdicts, on the ground that, although Florida law now requires her to show that she relied on a particular false statement made by Philip Morris, she presented sufficient evidence of Philip Morris's pervasive disinformation campaign and that she harbored a misapprehension about the health effects and/or addictive nature of smoking, such that a jury can infer her reliance.

Although in the past, Florida District Courts of Appeal routinely held that evidence of a pervasive disinformation campaign and a plaintiff's subsequent misapprehensions were sufficient to show detrimental reliance, the Florida Supreme Court rejected this approach earlier this year. *Prentice v. R.J. Reynolds Tobacco Co.*,

No. SC20-291, 2022 WL 805951, at *6–8 (Fla. 2022).    In so ruling, the Florida Supreme Court held that *Engle*-progeny plaintiffs bringing a fraudulent concealment or conspiracy to fraudulently conceal claim must prove reliance on one or more specific statements by an *Engle* defendant and that the statement or statements on which the plaintiff relied were false or misleading.  Accordingly, because Brown relies solely on the evidence of Philip Morris's disinformation campaign to establish her claims, we set aside Brown's jury verdicts for fraudulent concealment and conspiracy to fraudulently conceal due to insufficient evidence.  However, we affirm Brown's jury verdicts for her negligence and strict liability claims, and remand the case with the instruction that the District Court reduce Brown's damages by her comparative fault as the jury found in its verdicts.

## I.

### A.

This lawsuit is one of thousands of progeny suits filed in the wake of the Florida Supreme Court's decision in *Engle v. Liggett Group., Inc.* (*Engle III*), 945 So. 2d 1246 (Fla. 2006).  We have previously explored the history of the *Engle* litigation in depth, and so we describe that procedural history only briefly here.[3]  In 1994, Florida smokers and their survivors filed a class action against

---

[3] For a detailed account of the history of this litigation, see *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1174–81 (11th Cir. 2017) (en banc).

several major domestic cigarette companies, including Philip Morris, seeking compensatory and punitive damages for their smoking-related injuries. *Engle III*, 945 So. 2d at 1256. They alleged several claims against the tobacco company defendants, including strict liability, negligence, fraudulent concealment, and conspiracy to fraudulently conceal.

The *Engle* litigation proceeded in three phases. Phase I focused on common issues of liability "relating exclusively to the defendants' conduct and the general health effects of smoking." *Id.* The jury rendered a verdict in favor of the plaintiff class on all counts. *Id.* at 1256–57. Relevant here, the "Phase I findings" included: (1) that smoking cigarettes causes certain diseases, including PVD; (2) that nicotine in cigarettes is addictive; (3) that the tobacco companies placed cigarettes on the market that were defective and unreasonably dangerous; (4) that the defendants concealed or omitted material information, not otherwise known or available, knowing that the material was false or misleading, or failed to disclose a material fact concerning the health effects and/or addictive nature of smoking cigarettes; (5) that the defendants agreed to conceal or omit information regarding the health effects or addictive nature of smoking cigarettes with the intention that smokers and the public would rely to their detriment; (6) that all of the defendants sold or supplied cigarettes that were defective; (7) that all of the defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to representations of fact made by the defendants, and (8) that all of the defendants were negligent. *Id.* at

1257 n.4, 1276–77. In Phase II, the same jury determined that the tobacco companies were liable to the named class representatives; it awarded compensatory damages to the named plaintiffs and punitive damages to the class as a whole. *Id.* at 1257. In Phase III, new juries were to decide specific issues of individual liability and damages for the other class members. *Id.* at 1258.

On discretionary review of the judgments in Phase I and Phase II,[4] the Florida Supreme Court upheld the class certification with respect to Phases I and II but decertified the class with respect to Phase III "because individualized issues such as legal causation, comparative fault, and damages predominate." *Id.* at 1268. The Court retained the Phase I findings outlined above, and provided that those findings would have res judicata effect in future proceedings brought by the *Engle* class members.[5] We later recognized that the Florida Supreme Court's *Engle* decision gave the Phase I findings preclusive effect in federal court under the Full Faith and

---

[4] The Court in *Engle III* had jurisdiction because the decision of the Third District Court of Appeal conflicted with one of its prior opinions. *See* Fla. Const. art. V, § 3(b)(3) (noting that the Florida Supreme Court "[m]ay review any decision of a district court of appeal that . . . expressly and directly conflicts with a decision of . . . the supreme court on the same question of law").

[5] The Florida Supreme Court declined to give preclusive effect to the other Phase I jury's findings, which we omitted above, on the *Engle* plaintiffs' fraud and misrepresentation, conspiracy to misrepresent, and intentional infliction of emotional distress claims because they "involved highly individualized determinations." *Engle III*, 945 So. 2d at 1269. The Court also nullified the punitive damages award as prematurely granted. *Id.*

15-13160                  Opinion of the Court                        7

Credit Act, 28 U.S.C. § 1738.  *See Burkhart v. R.J. Reynolds Tobacco Co.*, 884 F.3d 1068, 1091–93 (11th Cir. 2018) (recognizing preclusive effect of the Phase I findings on fraudulent concealment and conspiracy to fraudulently conceal); *Graham*, 857 F.3d at 1186 (recognizing preclusive effect of the Phase I findings on negligence and strict liability).[6]

    Moving forward, *Engle* class members could initiate individual damages actions against the *Engle* defendants and the Phase I findings would have res judicata effect in those trials.  *Engle III*, 945

---

[6] As a result of the Phase I *Engle* findings, duty and breach for certain causes of action, including negligence, strict liability, fraudulent concealment, and conspiracy to fraudulently conceal, are conclusively presumed for plaintiffs who show that they are class members.  *See Burkhart*, 884 F.3d at 1082, 91–93; *Graham*, 857 F.3d at 1175.  Plaintiffs must still demonstrate causation and damages—and questions have remained over how *Engle*-progeny plaintiffs could prove causation.  *See Burkhart*, 884 F.3d at 1082; *Graham*, 857 F.3d at 1175.  In *Graham*, we gave preclusive effect to the *Engle* findings on negligence and strict liability that established duty and breach for those causes of action, even though those findings did not establish what components of the defendants' cigarettes were negligently produced or defective or unreasonably dangerous.  *Graham*, 857 F.3d at 1186.  What that meant, under Florida law, is that a plaintiff need only prove that an addiction to an *Engle* defendant's cigarettes was the legal cause of the plaintiff's health problems, as well as proving the resulting damages.  So, an *Engle*-progeny plaintiff need not establish that a specific breach of duty—that is, any negligently produced or unreasonably dangerous aspect of the cigarettes—caused their harm.  As our discussion *infra* shows, the Florida Supreme Court in *Prentice* took a different tack with respect to the fraudulent concealment and conspiracy to fraudulently conceal claims, where it required that plaintiffs show that a specific breach of duty—that is, a false or misleading statement—caused their harm.

So. 2d at 1269.[7]  With those findings established as a matter of law, the *Engle*-progeny trials would center on issues of individual causation, comparative fault, and damages.

### B.

Brown filed this *Engle*-progeny suit against Philip Morris in 2007, seeking compensatory and punitive damages related to her development of PVD after decades of smoking cigarettes manufactured by Philip Morris.  She alleged she was a member of the *Engle* class because she was addicted to smoking cigarettes and that addiction was a legal cause of her PVD, and she sought recovery for her injuries—including multiple surgeries and eventually the amputation of both her legs, which left her severely debilitated and unable to work—under theories of strict liability, negligence, fraudulent concealment, and conspiracy to fraudulently conceal.  A six-day jury trial on all four claims commenced in January 2015.

### i.

Brown began smoking cigarettes when she was fifteen years old.  Although she never intended to become a lifelong smoker, by age seventeen she was smoking regularly.  In her testimony at trial, Brown explained that when she began smoking, she did not know

---

[7] As noted in note 5 *supra*, the Florida Supreme Court in *Engle III* threw out the findings as to claims of fraud and misrepresentation, conspiracy to misrepresent, and intentional infliction of emotional distress, but retained the findings as to claims of fraudulent concealment and conspiracy to fraudulently conceal.

or understand that cigarettes could cause life-threatening diseases like PVD or that they were addictive. And she testified that her understanding of the dangers of cigarettes now is "very different" from what she understood when she first started. It took Brown many years and multiple attempts before she was finally able to quit smoking in June 2014.

When Brown first started smoking with her friends in high school, her cigarette of choice was the Marlboro brand produced by Philip Morris. She testified that she began smoking Marlboro cigarettes "[b]ecause that was the brand that everybody was buying" and because she liked it. Additionally, she cited the Marlboro Man advertisements as a reason she chose Marlboro cigarettes:

Q.    And why did you choose Marlboros?

A.    Because it was the thing to buy and I liked it.

Q.    Your friends, is that what your friends were smoking?

A.    Yes.

Q.    When you say it was the thing to buy, does that mean because that's what the other kids were smoking or some other reason?

A.    That and ads, you know.

Q.    What kind of ads?

A.    Marlboro man.

Q.     Okay. You remember seeing Marlboro adver-
tisements your senior year of high school?

A.     Yeah.

. . .

Q.     Okay. And what about the Marlboro ads made
you think -- made you feel that Marlboros were the in
thing to smoke?

A.     I said I don't know. It's the Marlboro man and
the packaging. I don't know.

Q.     What about the packaging?

A.     The red and white and -- I don't know, I really
can't tell you.

Q.     Okay. Anything else about Marlboro packag-
ing you remember other than it was red and white?

A.     No.

Q.     Anything else about Marlboro advertising you
remember other than there was the Marlboro man?

A.     Yeah.

Q.     What else?

A.     I mean --

15-13160                Opinion of the Court                11

Q.     What else do you remember other than there was a Marlboro man in the Marlboro advertisements?

A.     He had a saddle, I think it was, he was sitting on or something, leaning against, I don't know, something like that.

Q.     Anything else?

A.     Not really.

She also recalled being exposed to other cigarette advertisements as she was growing up:

Q.     Do you remember whether there were any cigarette advertisements --

A.     Yes.

Q.     -- going on when you were growing up?

A.     Yes.

Q.     Do you remember any of the advertisements that you saw growing up?

A.     Yeah, the guy with the hat. I can't think of his name now. Dadgum it, I can't think of his name.

Q.     Can't think of his name. Was he -- how would you describing [sic] him?

A.     He had a hat.

Q.    Had a hat?

A.    Hat on his head, Chester --

Q.    Was [sic] Marlboro man mean anything to you?

A.    Marlboro man, yeah. And also there was that other guy that had -- he had a hat, but he was -- I can't think of his name.

Q.    Was he with the Philip Morris company?

A.    Yes. Yes.

Q.    Okay. And this was something that you saw personally when you were growing up?

A.    Yeah, I saw it on billboards.

In addition to testimony about her personal experience, Brown also presented extensive testimony about Philip Morris's advertising and marketing campaigns. Specifically, Brown's historical expert testified that Philip Morris intentionally geared its advertising toward teenagers in the 1960s and 1970s because it recognized that teenagers were the "smokers of the future," and that it could capitalize on peer pressure among high school students to promote its Marlboro brand. The Marlboro Man advertisements were particularly appealing to young smokers because they presented an image that was quintessentially American: rugged, attractive, and independent.

The expert also explained that while Philip Morris continued to publicly refute the notion that smoking cigarettes was addictive and tied to serious health problems,[8] its internal documents revealed that the company was aware of and generally accepted the science linking cigarettes to lung cancer and other serious diseases. He testified that even in response to the Surgeon General's warning in 1964, the tobacco companies, including Philip Morris,

> continued to challenge the science in the public media creating an artificial controversy [and] doubt as to the truth of the matter linking cigarettes to serious disease. And they continued to heavily advertise their products and market their products. None of those ads ever indicated any problem with the cigarette.

It wasn't until 1999 that Philip Morris publicly acknowledged that its cigarettes are addictive and can cause disease.

ii.

Philip Morris's strategy in defending against Brown's claims for fraudulent concealment and conspiracy to fraudulently conceal was two-fold. First, Philip Morris attempted to undermine Brown's alleged reliance on Philip Morris's statements by arguing that Brown chose to smoke not because of anything Philip Morris had said about cigarettes, but because she liked it and because that

---

[8] For example, in their "Frank Statement to the Cigarette Smokers," the tobacco companies provided strong public assurances to smokers, stating, "We believe the products we make are not injurious to health."

was what her friends were doing.  On cross-examination, Philip Morris elicited testimony from Brown that she could not recall ever seeing a statement or advertisement from any tobacco company that represented that cigarette smoking was not harmful or not addictive.

Second, Philip Morris also attempted to undermine Brown's evidence of reliance by showing that Brown was long aware of the potentially harmful effects of smoking.  By 1966, around the time that Brown began smoking, every package of cigarettes sold in the United States had a federally mandated health warning on it.  Beginning at age 18, her doctors continually advised her to quit smoking due to the negative health effects, and Brown testified that she believed her doctors when they told her that smoking could cause lung cancer and heart disease.  Her mother and sisters also advised her to quit in the 1970s, after her mother suffered a heart problem and they decided to quit smoking.  But Brown did not try to quit at that time because, as she testified, she "was hardheaded."  Brown was again advised by her doctor to quit smoking in 1992, when she was diagnosed with PVD, but even then she did not immediately try to quit, testifying that she "tried towards the end, but not in the beginning."

Consistent with this strategy of targeting the sufficiency of Brown's evidence, at the close of her case, Philip Morris moved under Fed. R. Civ. P. 50(a) for judgment as a matter of law on Brown's fraud claims because Brown had insufficient evidence to present those claims to the jury.  Philip Morris principally argued

that Brown failed to establish the element of detrimental reliance because she presented no evidence to show that she relied on a specific statement by Philip Morris or its alleged co-conspirators and because she was sufficiently aware of the harm caused by smoking. The District Court denied the motion.

iii.

After six days of testimony, the case was submitted to the jury. With respect to Brown's fraudulent concealment claim, the District Court instructed the jury that "to award damages to Ms. Brown on her claim of fraudulent concealment, you must find that she relied on the statement or statements made by the defendant, Philip Morris, about the health effects or addictive nature of smoking, which concealed or omitted material information."

With respect to Brown's conspiracy claim, the District Court instructed the jury that Brown must prove that (1) "she relied to her detriment on an act done by the defendant or any other member of the conspiracy that agreed to conceal or omit information about the health effects of cigarettes or their addictive nature;" (2) "the act or acts upon which she relied was done in furtherance of the agreement to conceal or omit material information from the group's statement or statements regarding the health effects and/or the addictive nature of cigarettes;" and (3) "the concealment or omission had the effect of making . . . those statement or statements false or misleading and her reliance was a legal cause of her peripheral vascular disease."

The jury returned verdicts in favor of Brown on all claims. It allocated 45% of the comparative fault to Brown and 55% to Philip Morris and awarded Brown $8,287,448 in compensatory damages and $9 million in punitive damages. Because Brown prevailed on her fraud claims, the District Court did not reduce the compensatory damages award by the percentage of comparative fault attributable to Brown. *See* Fla. Stat. § 768.81(4) ("This section does not apply to any action . . . based upon an intentional tort . . . .").

Post-trial, Philip Morris renewed its motion for judgment as a matter of law on Brown's fraud claims under Fed. R. Civ. P. 50(b) and moved in the alternative for a new trial. Philip Morris again argued that Brown had failed to introduce sufficient evidence from which a reasonable jury could conclude that she relied to her detriment on any statement or omission by Philip Morris that concealed information about the health risks or addictive nature of cigarettes, and failed to show that but for such concealment, she would have avoided her injuries. Philip Morris argued that even if the Court denied the motion for judgment as a matter of law, it should grant Philip Morris a new trial because the verdict was against the great weight of the evidence.

The District Court denied the motion, holding that the jury's verdict was supported by "sufficient evidence from which a reasonable jury could conclude that Brown reasonably relied on Philip Morris to disclose the addictive nature of cigarettes and the harmful nature of smoking." *Brown v. R.J. Reynolds Tobacco Co.*,

No. 3:09-CV-10687, 2015 WL 3796282, at *1 (M.D. Fla. June 18, 2015).  It explained that the jury could "infer detrimental reliance from evidence that the tobacco companies engaged in 'pervasive misleading' advertising campaigns and created a false controversy with the intent to create doubt about the harmful effects of smoking," and that Brown "presented overwhelming evidence that Philip Morris intentionally and calculatedly geared its advertising to attract and hook teenagers to smoking its brand while hiding the addictive nature of its cigarettes." *Id.*

The District Court further found that the evidence showed Philip Morris knew cigarette smoking was linked to certain diseases and that the nicotine in cigarettes was addictive, and yet Philip Morris never disclosed that information to the public. *Id.* at *2. Instead, Philip Morris "represented to the public, in a campaign spanning decades, that cigarettes were not harmful and not addictive," creating "false doubt among the public." *Id.* Based on this, the Court held that "a jury could reasonably conclude that Brown, like so many others, was induced to rely and did so rely, to her detriment, on Philip Morris to reveal the negative health effects of smoking and its addictive nature."[9] *Id.*

---

[9] The District Court similarly held, on her conspiracy claim, that this evidence was sufficient for a reasonable jury to conclude that "she relied to her detriment on Philip Morris's acts and omissions, committed with other co-conspirators . . . , of withholding information about cigarettes' addictiveness and harmful health effects." *Brown v. R.J. Reynolds Tobacco Co.*, No. 3:09-CV-10687, 2015 WL 3796282, at *3 (M.D. Fla. June 18, 2015).

C.

Philip Morris appeals the District Court's judgment on all claims. Phillip Morris makes two arguments on appeal.

Philip Morris first argues that the District Court denied Philip Morris due process of law by giving the *Engle III* findings preclusive effect as to Brown's claims of negligence, strict liability, fraudulent concealment, and conspiracy to fraudulently conceal and that federal law preempts Brown's claims of negligence and strict liability. Our precedent in *Graham* and *Burkhart* forecloses this argument, as Philip Morris recognizes, and it merely seeks to preserve the issue for further review.

Second, Philip Morris challenges the sufficiency of the evidence to support Brown's fraud claims. Philip Morris argues, and we agree, that the Florida Supreme Court's decision in *Prentice* renders our precedent on the fraud claims—specifically *Cote v. R.J. Reynolds Tobacco Co.*, 909 F.3d 1094, 1108 (11th Cir. 2018)—obsolete.[10] Accordingly, Philip Morris argues that the District Court

---

[10] In *Cote*, we interpreted Florida law as not requiring that a plaintiff "show reliance on a specific statement." *Cote*, 909 F.3d at 1108; *see also R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1069 (Fla. 1st Dist. Ct. App. 2010); *Evers v. R.J. Reynolds Tobacco Co.*, 195 So. 3d 1139, 1140 (Fla. 2d Dist. Ct. App. 2015); *Philip Morris USA, Inc. v. Duignan*, 243 So. 3d 426, 441–42 (Fla. 2d Dist. Ct. App. 2017); *Philip Morris USA, Inc. v. McCall*, 234 So. 3d 4, 14–15 (Fla. 4th Dist. Ct. App. 2017). Rather, under Florida law at the time, a plaintiff could prove reliance by presenting evidence that she was (1) exposed to the tobacco companies' pervasive disinformation campaign and (2) subsequently harbored

erred in denying its renewed motion for judgment as a matter of law because Brown did not offer sufficient evidence of detrimental reliance or legal causation under Florida law.  She presented no evidence, Philip Morris contends, that she was exposed to any statement by any tobacco company that, through concealment, omission, or otherwise, falsely communicated that cigarette smoking was not harmful or addictive.  Philip Morris also argues that, because the jury's punitive damages award was based solely on the fraud claims, we should vacate that award too.  Further, Philip argues that if we reverse the District Court's order on the 50(b) motion, we should remand the case and instruct the District Court to reduce the jury's compensatory damage assessment by the amount of comparative fault that the jury found in its verdicts.  *Sowers v.*

---

a misapprehension about the health effects and/or addictive nature of smoking, such that she would have behaved differently had she known the true facts.  *Cote*, 909 F.3d at 1108.  The Florida courts, in other words, treated the evidence of pervasive disinformation campaigns, and the "false controversy created by the tobacco industry" as a whole, as a form of "circumstantial evidence" from which juries could infer the detrimental reliance of plaintiffs.  *See Martin*, 53 So. 3d at 1069.

Our prior panel precedent rule requires us to follow a prior panel's holding unless abrogated later by the Supreme Court or this Court sitting en banc.  *See Smith v. GTE Corp.*, 236 F.3d 1292, 1302–03 (11th Cir. 2001).  However, we are not bound by a previous decision of this Court interpreting state law if "subsequent decisions of the United States Supreme Court or the Florida courts cast doubt on our interpretation of state law."  *Hattaway v. McMillian*, 903 F.2d 1440, 1445 n.5 (11th Cir. 1990) (emphasis omitted).  *Prentice* casts doubt on the interpretation of state law in *Cote* and so *Cote* no longer binds us.

*R.J. Reynolds Tobacco Co.*, 975 F.3d 1112, 1135 (11th Cir. 2020). We agree and reverse the District Court's denial of judgment as a matter of law on the fraud claims, vacate the punitive damages award, and remand the case and instruct the District Court to reduce the remaining award by comparative fault.[11]

In Part II, we analyze the sufficiency of the evidence to sustain the jury's verdict on Brown's fraud claims under the new causation standard announced by the Florida Supreme Court in *Prentice*. Because we agree that Brown's evidence was insufficient under *Prentice*, we address the proper remedy on remand in Part III.

## II.

When reviewing evidentiary issues in a diversity case, "[w]e apply the federal standard to assess whether the evidence presented at trial was sufficient to raise a question of fact for the jury, but state law supplies the substantive law that we apply" the federal

---

[11] Philip Morris also asks that, if we reverse the District Court's denial of the 50(b) motion as to the fraud claims, we grant it a new trial on all issues. Specifically, it argues that the evidence of the fraud claims tainted the jury's assessment of (1) the negligence and strict liability claims; (2) compensatory damages; and (3) comparative fault. Because Philip Morris failed to raise these issues in its motion for new trial, we consider these issues forfeited and do not address them further. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

evidentiary standard to. *Cote*, 909 F.3d at 1107 (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S. Ct. 817 (1938)).

We review a renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) *de novo*, applying the same standards as the district court. *Id.* at 1103. "We consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party." *Id.* (quoting *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1275 (11th Cir. 2008)). We will "disturb the jury's verdict only when there is no material conflict" as to the evidence and where no reasonable juror could agree to the verdict. *Id.* (quoting *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285 (11th Cir. 2014)).

We apply these standards in determining whether Brown established her fraud claims under the rule laid down by the Florida Supreme Court in *Prentice*. There, the Florida Supreme Court held that for "fraudulent concealment and conspiracy to fraudulently conceal claims," an *Engle*-progeny plaintiff must prove (1) that the plaintiff relied to his detriment on a specific statement or set of related statements, (2) made by the defendant (or a co-conspirator in a conspiracy claim), (3) which are misleading as to the health effects or addictiveness of smoking cigarettes. *Prentice*, 2022 WL 805951, at *3, 6. In proving reliance, the plaintiff must show that he or she "received, believed, and acted upon the statements that omitted the material information" such that it was the "but for cause" of the plaintiff's harm. *Id.* at *6. Thus, appealing to the generalized disinformation campaign waged by tobacco

companies is not sufficient to show that a failure to disclose information caused one's injury. *See id.* at *6–8 (rejecting jury instruction that suggested that reliance on the "omissions" related to or a "conspiracy" based on tobacco company defendant's disinformation campaigns as sufficient to show reliance).

In ruling on Philip Morris's 60(b) motion, the District Court held that Brown's fraudulent concealment and conspiracy to fraudulently conceal claims were supported by "sufficient evidence" of reliance because "the tobacco companies engaged in 'pervasive misleading' advertising campaigns and created a false controversy with the intent to create doubt about the harmful health effects of smoking." *Brown*, 2015 WL 3796282, at *1 (citing *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1069 (Fla. 1st Dist. Ct. App. 2010)). In other words, the District Court's order faulted Philip Morris for simply failing to disclose to Brown the negative health effects and addictive nature of smoking in its widespread advertising campaign.

Under *Prentice*, the District Court was wrong. First, *Prentice* makes clear that Brown could not rely solely on the pervasive disinformation campaign waged by the Philip Morris to establish reliance. *Prentice*, 2022 WL 805951, at *6–8. Though she need not recall a particular moment in which she viewed a statement by Philip Morris, Brown needed to point to specific statements or advertisements by Philip Morris or its co-conspirators that she was exposed to and relied on. *Id.* at *6–7. The evidence Brown presented at trial consisted of, for the most part, her general exposure

to or mere awareness of Philip Morris's marketing campaign, which cannot establish reliance. *See id.* at *4 ("[T]here can be no reliance . . . if the plaintiff would have acted the same way regardless of whether the defendant had made the misrepresentation."). When asked explicitly why she started smoking Marlboro cigarettes, Brown stated that she started smoking because her friends were doing it and because she liked it.

The closest she came to offering evidence of her reliance on a specific statement (or even set of statements) by Philip Morris was her brief recollection of a Marlboro Man advertisement, but she could not explain what it was about the Marlboro Man advertisement that influenced her decision to smoke.[12] Finally, Brown could not identify any other statement made by Philip Morris or any other co-conspirator that conveyed, to her, a message that smoking was not harmful or addictive, and she claimed that she never heard of the Frank Statement or any other statements made by the Council for Tobacco Research, the Tobacco Industry Research Committee, or the Tobacco Institute, the entities at the

---

[12] On appeal, Brown claims that the images of the cowboys contained in the Marlboro Man advertisements gave her a misapprehension about the health effects and addictiveness of smoking cigarettes. However, at trial she stated that she did not know why these advertisements caused her to smoke or believe that smoking Marlboros was the "in thing." That testimony alone does not show that Brown relied on a statement by Philip Morris, instead of the influence of her friends. *See Prentice*, 2022 WL 805951, at *4 ("[R]eliance requires the plaintiff to have 'received, believed, and acted upon' a misstatement . . . .").

center of the tobacco industry's disinformation campaign.  The evidence, even in the light most favorable to Brown, is insufficient to create a jury question on whether she would "have acted the same way regardless of whether the defendant had made the misrepresentation." *See id.*

## III.

Finally, because we have reversed the District Court's order denying Philip Morris's 50(b) motion, we vacate the punitive damages award, which was supported only by the fraud claims.

## IV.

Accordingly, we **AFFIRM** in part, **REVERSE** in part, and **RE-MAND** this case to the District Court with instruction to reduce Brown's compensatory damages award by her comparative fault.

**SO ORDERED.**